# EXHIBIT E

McDowell vs. Lansing

12 CV 5025

.

Deposition of:  Michael Erasmo Rodriguez

Taken on:  March 04, 2013

**JENSEN LITIGATION SOLUTIONS**

160 North LaSalle Street
Suite 2800
Chicago IL 60601
312 236 6905
877 653 6735
www.jensenlitigation.com



McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   MARLO McDOWELL,                  )
                                      )
 4                Plaintiff,          )
                                      )
 5           vs.                      )   No. 12 CV 05025
                                      )
 6   VILLAGE OF LANSING and OFFICER   )
     MICHAEL RODRIGUEZ,               )
 7                                    )
                  Defendants.         )
 8

 9


10           The deposition of MICHAEL ERASMO RODRIGUEZ,

11   called by the Plaintiff for examination, taken pursuant

12   to notice and pursuant to the Federal Rules of Civil

13   Procedure for the United States District Courts

14   pertaining to the taking of depositions, taken before

15   Kathy J. Szotek, Certified Shorthand Reporter and Notary

16   Public, at 53 West Jackson Boulevard, Suite 252,

17   Chicago, Illinois, commencing at 1:19 p.m. on

18   March 4, 2013.

19

20

21

22

23

24
```

312 236 6930
877 o53 o736
Fax 312 236 o968
www.jensenlitigation.com


JENSEN
Litigation Solutions

McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Pages 2..5

Page 2

```
1   APPEARANCES.

2       FOUTRIS LAW OFFICE, LTD.
        MR. BASILEIOS J. FOUTRIS
3       53 West Jackson Boulevard
        Suite 252
4       Chicago, Illinois 60604
        Phone:  (312) 212-1200
5       E-mail  bfoutris@foutrislaw.com

6           On behalf of the Plaintiff;

7       ANCEL GLINK DIAMOND BUSH DiCIANNI & KRAFTHEFER
        MR  GREGORY S  MATHENS
8       140 South Dearborn Street
        6th Floor
9       Chicago, Illinois 60603
        Phone:  (312) 782-7606
10      E-mail  gmathews@ancelglink.com

11          On behalf of the Defendants

12

13                  *   *   *   *   *   *

14

15

16

17

18

19

20

21

22

23

24
```

Page 3

```
1                   I N D E X

2   WITNESS                                 PAGE

3   MICHAEL ERASMO RODRIGUEZ

4       Direct Examination by Mr. Foutris ......   4

5

6

7                 E X H I B I T S

8   RODRIGUEZ DEPOSITION EXHIBIT            PAGE

9       No. 1 ................................   7

10      No. 2 ................................  12

11      No. 3 ................................  12

12      No. 4 ................................  12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 4

```
1                   (Witness sworn.)

2   WHEREUPON:

3               MICHAEL ERASMO RODRIGUEZ,

4   called as a witness herein, having been first duly

5   sworn, was examined and testified as follows:

6                   DIRECT EXAMINATION

7   BY MR. FOUTRIS:

8       Q.   Could you please state your full name for the

9   record, please.

10      A.   Michael Erasmo Rodriguez.

11      Q.   Could you spell that for the court reporter,

12  please.

13      A.   M I C H A E L, E R A S M O, R O D R I G U E Z.

14      Q.   You're currently employed as a Lansing police

15  officer?

16      A.   Yes.

17      Q.   Let me give you some quick ground rules for a

18  deposition.  First, you need to give me all verbal

19  answers.  Do you understand that?

20      A.   Yes.

21      Q.   You need to wait until a question is fully

22  asked before you respond.  Do you understand that?

23      A.   Yes.

24      Q.   And if there's a question that's asked that
```

Page 5

```
1   you do not understand, you need to tell me.  Okay?

2       A.   Okay.

3       Q.   When did you start working for Lansing?

4       A.   July of 2007.

5       Q.   And I see that you graduated from Illinois

6   State University in 2006; is that correct?

7       A.   Yes.

8       Q.   And what did you do work wise from 2006

9   until -- graduating college in 2006 until you started

10  working with Lansing?

11      A.   I worked briefly at Apple.

12      Q.   Doing what?

13      A.   I was like a tech support for the iPhone.  I

14  was only in training there for about a week before I

15  left, is when I got the call to be a police officer.

16      Q.   Did you ever work for any other law

17  enforcement agencies?

18      A.   No.

19      Q.   And do you have any relatives who work for law

20  enforcement?

21      A.   None that I can think of.  I think there might

22  be a cousin or something or an uncle, but I'm not sure.

23      Q.   Okay.  And have you ever been in the military?

24      A.   No.
```



McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Page 6

1    Q.   You've been sued at least once before in
2   connection with your duties as a Lansing police officer;
3   is that correct?
4    A.   Yes.
5    Q.   And that was the case of Epting versus
6   Lansing, et al., E P T I N G; is that right?
7    A.   Yes.
8    Q.   And you stated here that you were an ancillary
9   defendant in that case; is that right?
10    A.   I believe so, yes.
11    Q.   What did you mean by that exactly; what were
12  the allegations in the case?
13    A.   The subject was arrested, he was refusing to
14  be placed in the squad car, and one of my coworkers
15  tased him to get him -- to gain compliance and he was
16  suing for that.
17    Q.   And you were present at the time that he was
18  tased?
19    A.   I was present.
20    Q.   Have you had any other lawsuits since you've
21  answered your interrogatories?
22    A.   No.
23    MR. FOUTRIS:  Let me just mark this as an exhibit
24  real quick.

Page 7

1            (Rodriguez Deposition Exhibit No. 1
2            marked as requested.)
3  BY MR. FOUTRIS:
4    Q.   You've been handed Exhibit No. 1, which is a
5  10-page document.  It's the answer -- defendant's
6  answers to interrogatories.  Do you recognize what's in
7  front of you, sir?
8    A.   Yes.
9    Q.   And does your signature appear on the
10  second-to-last page?
11    A.   Yes.
12    Q.   Okay.  And then I'll just --
13    MR. MATHEWS:  Just so you know, I have E-mailed
14  that to you.
15    MR. FOUTRIS:  Okay.
16  BY MR. FOUTRIS:
17    Q.   All right.  So just before the deposition
18  began, Officer, I was informed that there may be an
19  amended answer which actually has a change to one answer
20  to this set of interrogatories; is that right?
21    A.   Yes.
22    Q.   That would be the answer to Question No. 11
23  regarding complaints of alleged police misconduct; is
24  that correct?

Page 8

1    A.   Yes.
2    Q.   Okay.  Aside from that question which was
3  unanswered, this document before you, these answers to
4  interrogatories, are the rest of these true and accurate
5  to the best of your knowledge?  And you can take the
6  time to look at them.
7    A.   Yeah.  I know there was -- This says 2002 to
8  the present, and I worked for a clothing store as a
9  part-time employee.
10    Q.   What --
11    A.   For No. 2.
12    Q.   Oh, answer to No. 2?
13    A.   Yeah.  And for No. 6, I'm now a detective to
14  be added to that.
15    Q.   Okay.  Anything else?
16    A.   I don't believe so.
17    Q.   All right.  So in answer to No. 11, have you
18  had any complaints alleging police misconduct filed
19  against you?
20    A.   Yes.
21    Q.   How many?
22    A.   One that I can think of specifically.
23    Q.   When was that and what was the nature of the
24  allegations?

Page 9

1    A.   I believe it was in 2011, and a subject was
2  unhappy with her arrest and she made complaints and went
3  to the police department.
4    Q.   You specifically?
5    A.   I was named on there, yeah.  I was the
6  arresting officer.
7    Q.   Was she claiming that it was a false arrest or
8  that there was something else involved?
9    A.   Yeah, it was something like that.  I'm trying
10  to think of exactly how she had it.
11    Q.   But what happened; was the complaint
12  sustained, not sustained?
13    A.   It was unfounded.
14    Q.   Unfounded?
15    A.   Yes, I think that's the word.
16    Q.   Okay.  And any other complaints of misconduct
17  that you can think of?
18    A.   No.
19    Q.   Have you been disciplined at all in connection
20  with your duties as a Lansing police officer?
21    A.   I received a written reprimand once.
22    Q.   What was that for?
23    A.   I allowed a subject to be placed into a cell
24  with their belt on.

McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Pages 10..13

Page 10

1    Q.   Okay.  Anything else?
2    A.   No other reprimands.
3    Q.   Okay.  And so your assignments in the police
4  department have been patrol officer and detective and
5  FTO; is that right?
6    A.   Yes, I am an FTO, although I have never -- I
7  did like one partial training one time, but I was never
8  officially training a new employee; but I am an FTO.
9    Q.   All right.  And when you became a detective,
10  did you go through additional training?
11    A.   Yes.
12    Q.   And was that through Reid or something
13  different?
14    A.   I did a Reid class.
15    Q.   Okay.  And are you a part of any MEG units?
16    A.   MEG?
17    Q.   MEG, M E G, metropolitan enforcement groups.
18    A.   No.
19    Q.   Have you ever been loaned out to any agencies,
20  like the DEA or the ATF?
21    A.   No.
22    Q.   Prior to June 25th, 2011, to your knowledge
23  had you ever interacted with Marlo McDowell?
24    A.   No.

Page 11

1    Q.   How about Noelle Folden, Richard Birkenfeld,
2  Donald Birkenfeld, Ricky Ramirez, or Stephen Morandi?
3    A.   No.
4    Q.   After June 25, 2011, did you interact with any
5  of those people outside of any court proceedings that
6  you know of?
7    A.   No.
8    Q.   And what do you know about the plaintiff's
9  claims of injuries in this case?
10    A.   I think I heard he sustained an injury to his
11  jaw.
12    Q.   Okay.  Do you have any other specific
13  information about that or just generally that he
14  sustained an injury to his jaw?
15    A.   I believe I heard it was a broken jaw, but
16  officially I haven't heard or I haven't seen any
17  documents or anything like that.  I think somebody told
18  me that.
19    Q.   What did you do to prepare for today's
20  deposition?
21    A.   Spoke to my attorney.
22    Q.   Did you review any documents?
23    A.   These (indicating).
24    Q.   Just the answers to interrogatories?

Page 12

1    A.   I think I reviewed a little bit of the Cook
2  County case report.
3        MR. FOUTRIS:  Let me just mark three sets of
4  exhibits.
5                  (Rodriguez Deposition Exhibit
6                  Nos. 2-4 marked as requested.)
7  BY MR. FOUTRIS:
8    Q.   Officer, you've been handed three sets of
9  exhibits.  Let me identify them for the record.  Exhibit
10  No. 1 is an incident report from the Cook County
11  Sheriff's Department.  It's Bates-stamped D1 and 2.  Do
12  you have that in front of you?
13        MR. MATHEWS:  You mean Exhibit 2?
14        MR. FOUTRIS:  That's what I meant.  Thank you.
15  BY THE WITNESS:
16    A.   Yes.
17    Q.   Exhibit No. 3 is another offense, slash,
18  incident report from the Cook County Sheriff's
19  Department.  This is Bates-stamped D3 and 4.  Do you
20  have that in front of you as well?
21    A.   Exhibit 3, yes.
22    Q.   Okay.  And then Exhibit No. 4 is an incident
23  report from Lansing.  This is Bates-stamped D5 and 6.
24  Do you have that in front of you, sir?

Page 13

1    A.   Yes.
2    Q.   Okay.  All right.  Now, which, if any, of
3  these sets of documents in front of you did you review?
4  I mean, they're so voluminous I'm sure you can't
5  remember which ones.
6    A.   It was either one or both of these.
7    Q.   Okay.  So you're talking about the Cook County
8  Sheriff's Department?
9    A.   Yes.
10    Q.   How about the Lansing incident report?
11    A.   I think I've seen this too before.
12    Q.   Did you author any reports in connection with
13  this incident?
14    A.   No.
15    Q.   And just to be clear for the record,
16  Exhibits 3 and 4 -- or 2 and 3 I should say -- let me
17  withdraw that.
18        To be clear for the record, Exhibits 2 and 3,
19  the Sheriff's Police Department incident reports, did
20  you have anything to do with creating these documents?
21    A.   No.
22    Q.   And why is it that you did not prepare any
23  kind of report with respect to this incident?
24    A.   The incident occurred outside of Lansing

312 236 6936
877 653 6736
Fax 312 236 6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Pages 14..17

Page 14

1   jurisdiction.  It was turned over to Cook County.  It
2   was their jurisdiction.  I was responding as an
3   assisting officer to them.
4       Q.   Do you know who Cook County Sheriff's police
5   deputy Sheriff Morgan is?
6       A.   You said Morgan?
7       Q.   Yeah, Morgan.
8       A.   No.
9       Q.   He's the one who authored these incident
10  reports that you have in front of you.
11      A.   No.
12      Q.   It doesn't ring a bell?
13      A.   No.
14      Q.   Did you know by name any of the Sheriff's
15  deputies that responded to the Bottoms Up?
16      A.   No.
17      Q.   Have you seen any of those deputy sheriffs
18  since that date?
19      A.   I don't recall.
20      Q.   Okay.  There were two prosecutions that
21  stemmed from this incident.  There was one of Stephen
22  Morandi and there was one of Richard Birkenfeld.  Were
23  you aware of that?
24      A.   I testified, I believe, on Morandi's.

Page 15

1       Q.   Do you know what happened as a result of that
2   case?
3       A.   No, I don't know for a fact.  I was just
4   discussing that today.  He might have been convicted,
5   but I don't know for a fact.
6       Q.   All right.  How about Richard Birkenfeld's
7   case, do you know what happened with that case?
8       A.   No, I do not.
9       Q.   Were you ever contacted by the State's
10  attorneys office in connection with that case?
11      A.   Not that I recall.
12      Q.   Okay.  Do you recall what the plaintiff looked
13  like on that date, race, height, weight, without looking
14  at the reports in front of you?
15      A.   Who do you -- Who's the plaintiff?
16      Q.   Marlo McDowell.
17      A.   Mr. McDowell?
18      Q.   Yes.
19      A.   I recall that he's a male black subject.
20      Q.   Do you recall anything --
21      A.   Probably in his 20s.
22      Q.   I'm sorry.  I didn't mean to interrupt.  Could
23  you please continue.
24      A.   I believe he's in his 20s.

Page 16

1       Q.   Do you remember anything else about his
2   appearance?
3       A.   I don't know for a fact.  I think he has short
4   hair.
5       Q.   On the date that you testified in the criminal
6   case against Mr. Morandi, did you interact at all with
7   Marlo McDowell?
8       A.   I don't believe so, no.
9       Q.   Did you see him?
10      A.   I believe I saw him at the trial.
11      Q.   Where did you see him?
12      A.   In the courtroom.
13      Q.   Was this while you were testifying?
14      A.   I believe so.  I believe I remember seeing him
15  there while I was testifying.
16      Q.   Listening to what you were saying?
17      A.   Yes.
18      Q.   Were you able to listen to what other people
19  were saying or were you excluded?
20      A.   I was excluded.  I was brought in to testify.
21      Q.   Are you guessing that Mr. McDowell was there
22  at the time that you were testifying?
23      A.   I thought I remember seeing him there, but I
24  guess I don't know for a fact he was or not.

Page 17

1       Q.   Okay.  Aside from maybe seeing him in the
2   courtroom while you were testifying, did you see
3   Mr. McDowell at any other point in time during the
4   criminal case against Mr. Morandi?
5       A.   No, not that I recall.
6       Q.   Did you ever have any kind of conversation at
7   all with Mr. McDowell?
8       A.   Outside of the incident?
9       Q.   Right.
10      A.   No, not that I recall.
11      Q.   Did you ever go to the hospital where
12  Mr. McDowell was located following the incident?
13      A.   No.
14      Q.   Did anybody from Lansing to your knowledge go
15  to that hospital while --
16      A.   Not to my knowledge.
17      Q.   -- Mr. McDowell was there?
18      A.   Not to my knowledge.  I'm sorry.
19      Q.   I know we're talking over one another, we're
20  going really quick, but I'll try to stop if you will
21  too.  Okay?
22      A.   Okay.
23      Q.   All right.  So let's talk about June 25th,
24  2011.  You were on duty as a Lansing police officer that

312 236 6936
877 653 6736
Fax 312 236 6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-05025 Document #: 32-5 Filed: 07/29/13 Page 8 of 30 PageID #:159

McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Pages 18..21

Page 18

1   date; is that right?
2       A.   Yes.
3       Q.   And what was your assignment on that day?
4       A.   Patrol officer.  Patrol.
5       Q.   In uniform?
6       A.   Yes.
7       Q.   Could you describe your uniform, please.
8       A.   It's a dark -- dark blue, like a midnight
9   blue, silver badge.
10      Q.   Dark blue pants and shirt?
11      A.   Yes.
12      Q.   And were you in a marked squad car?
13      A.   Yes.
14      Q.   Did your squad car have a squad car camera in
15  it?
16      A.   Yes.
17      Q.   And how did that squad car camera operate?
18      A.   It becomes active when the lights turn on.
19      Q.   You mean the Mars lights?
20      A.   Pardon?
21      Q.   The Mars lights?
22      A.   The top lights on the squad, yes, the
23  emergency lights.
24      Q.   That's automatic?

Page 19

1       A.   Yes.
2       Q.   Is this a digital squad car camera or is this
3   one of those old fashioned ones where you're still
4   putting a videotape in there?
5       A.   We had upgraded and I don't know the exact
6   date of the upgrade, so I don't know which version was
7   in at that time.
8       Q.   Now, are you assigned a specific squad car
9   every shift or do you have a different one per shift?
10      A.   We are assigned squad cars, but it depends if
11  it's not operational or for whatever reason you may take
12  another squad car.  So I don't know if that was my
13  assigned squad car that date or if it was maybe a pool
14  car.
15      Q.   Okay.  But your squad car on that date
16  definitely had a squad car camera?
17      A.   To my knowledge, yes.
18      Q.   And is there just one that points out in front
19  of the squad car or is there also a camera that goes to
20  the cage?
21      A.   We now have one in the cage.  It wasn't always
22  like that.  So I don't know if there was one at that
23  time or not pointing at the cage.
24      Q.   And the squad car camera that was in the squad

Page 20

1   car on that date, did it also have a microphone that you
2   could place on your person?
3       A.   Yes.
4       Q.   And did you have that microphone on you?
5       A.   I don't recall activating it on, so I don't
6   believe it was on.
7       Q.   I'm not asking if it was turned on.  I'm
8   asking if you actually had it on your person?
9       A.   Oh, had it on my person, more than likely.
10      Q.   And where would you normally clip it?
11      A.   My shoulder.
12      Q.   And how does the squad car camera turn on
13  aside from the Mars lights -- the emergency lights?
14      A.   You can manually turn it on by hitting a
15  record button.  You could also activate it with the
16  microphone.
17      Q.   Could you --
18      A.   By activating the microphone -- turning the
19  microphone on should automatically activate the camera.
20      Q.   Okay.  So for instance just hypothetically, if
21  you're outside of your squad car and you want to
22  activate the camera you don't have to go back in, you
23  can just turn on your microphone?
24      A.   You could either turn -- turning it on may

Page 21

1   activate it or you may have to push a button on it, but
2   that usually works, either turning it on or pushing a
3   button if it's already on.
4       Q.   Okay.  And when the camera goes on, does the
5   mike go on too?
6       A.   If the microphone is turned on, yes, it will
7   start recording audio.
8       Q.   And the squad car camera, where was it
9   located; was it in the front window, was it -- just
10  without guessing, just tell us where it was mounted?
11      A.   It's pointing out the front windshield looking
12  forward.
13      Q.   In the center of the windshield?
14      A.   About the center.
15      Q.   Okay.  Is there also a screen of some kind,
16  like a digital type screen that shows you when you're in
17  the squad car what is being recorded on the video
18  camera?
19      A.   With the old camera there was a screen mounted
20  near it that you could turn on and off.  With the new
21  camera system we have now you can view the screen
22  through the laptop.
23      Q.   You're talking about the MDT, PDT system?
24      A.   Yes.



McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Pages 22..25

Page 22

1    Q.   Which one was in effect at that time?
2    A.   I don't recall.
3    Q.   But certainly there was --
4    A.   One or the other.
5    Q.   -- one or the other?
6         And did you check to see if that squad car
7    camera was working at the beginning of your shift?
8    A.   I don't recall.
9    Q.   Do you know if it was working?
10   A.   I don't recall.
11   Q.   Anything that might help you remember that?
12   A.   Unless they have some records at the police
13   department, some footage of me, no.
14   Q.   Do you have to -- As part of your protocol
15   when you get into the squad car, do you have to check to
16   see if it's working?
17   A.   Yeah, you're supposed to sync your microphone
18   and check.
19   Q.   And how do you go about doing that?
20   A.   You place your microphone into the microphone
21   dock inside the squad car and -- just to sync it, which
22   is -- I'm in the practice of doing.
23   Q.   Okay.
24   A.   So ...

Page 23

1    Q.   And if you do that and you notice that the
2    squad car camera or the microphone are not working, do
3    you have to fill out any kind of paperwork indicating
4    that it's not working?
5    A.   Yes, you should do that.
6    Q.   And can you explain what kind of document
7    you're supposed to document that in?
8    A.   Similar -- It's like a work order -- a work
9    order type document just specifically stating what's
10   wrong, you know, with the vehicle.
11   Q.   And do you then turn that in at the end of
12   your shift or do you turn it in before you leave the
13   station?
14   A.   It's no specific time.  Probably before you
15   leave preferably.
16   Q.   And where do you turn that in?
17   A.   To a sergeant.
18   Q.   And what is the -- Is it titled something or
19   is it just called work order?
20   A.   It's like a vehicle repair order.
21   Q.   Do you have any memory at all of preparing any
22   such repair order in connection with the squad car
23   camera?
24   A.   No memory of that.

Page 24

1    Q.   Okay.  And the vehicle repair order would
2    specifically say that the squad car camera is not
3    working?
4    A.   If I wrote one, yes.
5    Q.   I'm sorry?
6    A.   If I did write one, that's what I -- I would
7    write something similar to that.
8    Q.   And you had a Taser on that date as well?
9    A.   Yes.
10   Q.   What was the model?
11   A.   X26.
12   Q.   Did it have a Taser camera on it?
13   A.   No.
14   Q.   Did you check to see if that was functioning
15   by way of a field test?
16   A.   I'm in the practice of turning it on, but I
17   don't recall that day exactly turning it on prior to the
18   incident.
19   Q.   Now, did that Taser have a functioning laser
20   pointer?
21   A.   To my recollection, yes.
22   Q.   And was the laser pointer turned on during
23   this incident?
24   A.   I believe that it was.

Page 25

1    Q.   And the prongs that were attached to the
2    Taser, were they 15-foot, 25-, or 35-foot prongs?
3    A.   I believe, 25.
4    Q.   That's the ones with the yellow, right?
5    A.   Yes, yellow.
6    Q.   And the way the Taser works, if memory serves,
7    is the laser pointer is supposed to point where the top
8    prong would be deployed not where the bottom prong would
9    be deployed; is that right?
10   MR. MATHEWS:  I just object to the incomplete
11   hypothetical, but go ahead.
12   BY THE WITNESS:
13   A.   There's a spread.  So depending on the
14   distance, you know, it -- there's no way -- it's not
15   going to hit exactly where -- more than likely exactly
16   where the dot is at because the greater the distance the
17   greater the spread of the two probes.
18   Q.   Okay.  And you had been Taser certified prior
19   to this date?
20   A.   Yes.
21   Q.   And you had deployed your Taser prior to that
22   date at least in training exercises; is that right?
23   A.   Yes.
24   Q.   And had you been tased yourself during those

McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Pages 26. 29

Page 26

1  training exercises?
2     A.   Yes.
3     Q.   And had you ever deployed your Taser in the
4  field prior to that date?
5     A.   Yes.
6     Q.   On how many times?  Give us a ballpark.
7     A.   Ballpark, three times.
8     Q.   Okay.  And when was the last time that you had
9  been Taser certified prior to June 25th, 2011, if you
10 know?
11    A.   I don't recall.
12    Q.   Is it once a year, twice a year, once every
13 two years; what is it in Lansing?
14    A.   I'd have to review my training documents.  I
15 don't know.
16    Q.   When did you first become Taser certified; was
17 that in your initial probationary status?
18    A.   I took the Taser class at the police academy
19 for the first time.
20    Q.   At PTI?
21    A.   Yes, PTI.
22    Q.   So that would have been sometime in 2007?
23    A.   Yes.
24    Q.   And you had been Taser recertified since then?

Page 27

1     A.   Yes.
2     Q.   Through Lansing?
3     A.   Yes.
4     Q.   Okay.  And you had taken people into custody
5  prior to June 25th, 2011; is that correct?
6     A.   Yes.
7     Q.   You detained people prior to that date?
8     A.   Yes.
9     Q.   And as a police officer, when would you define
10 somebody as being in your custody or being detained by
11 you?
12    A.   I would define that when their freedom of
13 movement is restricted as being them taken into custody
14 or detained.
15    Q.   Okay.  Was Marlo McDowell in your custody
16 prior to him being kicked?
17    A.   I would say he was being detained.
18    Q.   Okay.  So his freedom of movement was being
19 restrained by you?
20    A.   Yes.
21    Q.   Okay.  Again, June 25th, 2011 you were on
22 duty.  What time did your shift start?
23    A.   I believe 11:00 p.m. that night.
24    Q.   So it would have begun at June 24th, 2011; is

Page 28

1  that right?
2     A.   Yes, that sounds right.
3     Q.   And when was your shift supposed to end?
4     A.   7:00 a.m.
5     Q.   And do you recall arresting --
6     A.   Correction.  I believe it was 7:30.  It's
7  eight and a half hours.
8     Q.   Thank you.  And do you recall having arrested
9  anybody else or taken any other police action during
10 this shift?
11    A.   I don't recall.
12    Q.   At some point you heard that there was
13 something involving Bottoms Up; is that right?
14    A.   Yes.
15    Q.   Had you been to that location before?
16    A.   Yes.
17    Q.   And were you familiar with the area?
18    A.   Yes.
19    Q.   And that was unincorporated Lansing; is that
20 correct?
21    A.   Correct.
22    Q.   So how did you first if -- And if you need to
23 review those documents in front of you to help jog your
24 memory a little bit --

Page 29

1     A.   Okay.
2     Q.   -- please do that.  All right?
3     A.   Okay.
4     Q.   Now, how did you learn that there was
5  something involving Bottoms Up?
6     A.   I received a dispatch.
7     Q.   And what is the dispatch service that Lansing
8  police used at the time; was that in-house or is that
9  some other organization?
10    A.   In-house.
11    Q.   What did you learn through the dispatch?
12    A.   I believe it was a call for a fight in
13 progress at Bottoms Up.
14    Q.   Was there anything else that you knew at that
15 point or just that -- was that just it?
16    A.   That's all I can recall.
17    Q.   Anything that might help you remember anything
18 else?
19    A.   Dispatch.
20    Q.   Please look at it.
21    A.   Thank you.  It says a subject being jumped in
22 parking lot; reportedly an off-duty officer and two
23 suspects; one male black, black shirt and khaki shorts;
24 two male white; no further description.



McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Page 30

1    Q.    So what you're doing is you're actually
2  reading from a portion of the Lansing incident report
3  from specifically page D6; is that right?
4      A.    Correct.
5      Q.    Okay.  Does that actually help jog your memory
6  as to what you learned during this dispatch?
7      A.    I don't remember that.  From what I remember
8  it was a fight in progress, but I don't remember
9  descriptions or anything.
10     Q.    Okay.  And did you acknowledge the dispatch?
11     A.    Yes.
12     Q.    Were you specifically dispatched to this call?
13     A.    I believe I was, yes.
14     Q.    And did you work a specific beat at the time
15  or was it a whole citywide that you were working?
16     A.    I don't remember my beat assignment that day.
17     Q.    But you do have beats?
18     A.    We do.  There was also a float beat too.
19     Q.    A float meaning going from one beat to the
20  other as an extra car?
21     A.    Yeah, meaning any beat.
22     Q.    How many beats are in Lansing?
23     A.    Four.
24     Q.    So being fully staffed that would mean you'd

Page 31

1  have five squad cars out; is that right?
2      A.    Minimum shifts are different depending on the
3  time.
4      Q.    Okay.  Would it be one squad per beat plus one
5  floater?
6      A.    For midnights a minimum is four patrol
7  officers and one supervisor.
8      Q.    And who was your direct supervisor on that
9  date?
10     A.    I don't recall.
11     Q.    Looking at this document in front of you to
12  see if that helps jog your memory.
13     A.    Does not appear to specify.
14     Q.    We have -- I'm looking at this first page of
15  the incident report.  The personnel are Percak,
16  P E R C A K -- and I don't know if I pronounced that
17  right -- there's a Yonker, a Hynek, and a Jones in
18  addition to you.  Do you see where I'm reading from?
19     A.    Yes.
20     Q.    Would one of those people have been your
21  supervisor?
22     A.    No.
23     Q.    Are these all squad -- Strike that.
24         Are those all patrol officers?

Page 32

1      A.    Yes.
2      Q.    Okay.  And would there have been an officer in
3  charge or sergeant at the time?
4      A.    We don't have an officer in charge, so it
5  would be a sergeant or a lieutenant.
6      Q.    And -- Okay.  So where were you when you heard
7  that dispatch about the battery in progress?
8      A.    I don't recall my exact location.
9      Q.    And what did you do when you heard the
10  dispatch?
11     A.    I began to respond to Bottoms Up.
12     Q.    And how did you do that?
13     A.    I drove there in my patrol car.
14     Q.    Well, did you go there as fast as you could?
15     A.    I believe I went with my lights -- at least my
16  lights on and I expedited.  Not as fast as I could
17  possibly drive, but I expedited.
18     Q.    Okay.  And did you eventually get to Bottoms
19  Up?
20     A.    Yes.
21     Q.    Were you the first police officer that arrived
22  as far as you know?
23     A.    Yes.
24     Q.    And where did you park?

Page 33

1      A.    Parked in the area of the front entrance.
2      Q.    And which direction was your squad car
3  pointing?
4      A.    It was pointing in probably like a northwest
5  type angle.
6      Q.    And would that be pointing towards the front
7  entrance of the Bottoms Up or in a different location?
8      A.    Towards it at a diagonal, from my
9  recollection.
10     Q.    Would it also be pointing towards the parking
11  lot?
12     A.    It was pointing towards the building itself.
13  The parking lot was west of that location.  It was
14  slightly pointing that way.
15     Q.    Now, when you said you put your lights on to
16  go there, would those -- those would have been the
17  emergency lights; is that right?
18     A.    Yes.
19     Q.    And had your squad car camera been
20  functioning, it would have been turned on by that?
21     A.    Correct.
22     Q.    And did you ever turn off the squad car
23  camera?
24     A.    I don't recall if I turned the lights off.  I



McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Page 34

1  think I did turn the lights off once I got on scene.
2      Q.   I'm talking about the squad car camera itself;
3  do you have any memory of turning it off?
4      A.   We don't have the ability to manually shut the
5  camera off.  It shuts itself off when the lights are
6  turned off.
7      Q.   Okay.  And you indicated that you believe you
8  turned the lights off when you arrived?
9      A.   I believe I did.  I don't recall exactly
10 though.
11     Q.   Why did you do that or why do you believe you
12 did that?
13     A.   There would have been no reason for them to
14 stay on.  But if I ran out of the car, I may not have
15 shut them off.  I don't remember.
16     Q.   Okay.  Well, on the way to Bottoms Up, were
17 there any further -- was there any further information
18 that you learned from dispatch other than the initial
19 dispatch?
20     A.   Those descriptions may have come out on the
21 air, but I don't recall.
22     Q.   Did you contact dispatch to inform dispatch
23 that you had arrived at Bottoms Up?
24     A.   I would have done that out of practice.  I

Page 35

1  don't recall doing it, but I probably did.
2      Q.   Anything that might help you remember if in
3  fact you did?
4      A.   Take a look here.
5      Q.   Yeah, go ahead.
6      A.   I don't know if this says.  I don't see it
7  documenting me calling it in.
8      Q.   Does that mean you did not?
9      A.   No.
10     Q.   You could have still called in?
11     A.   Sure, yes.
12     Q.   But you have no memory either way?
13     A.   I don't have -- I don't remember exactly if I
14 did or not.
15     Q.   Okay.  And how long did it take you to get to
16 Bottoms Up from the time you got the dispatch?
17     A.   I'd say about a minute to a minute and a half.
18     Q.   All right.  And -- All right.  So you got to
19 Bottoms Up, you indicated that you parked in the front
20 by the front entrance; right?
21     A.   Yes.
22     Q.   Did you see any people outside of the Bottoms
23 Up when you first arrived?
24     A.   Not that I recall.

Page 36

1      Q.   Okay.  And what did you do when you got there?
2      A.   Something drew my attention to the parking
3  lot.  I don't remember exactly what it was.  It may have
4  been somebody pointing out -- pointing me to that
5  direction, but I ran over to where the incident was
6  happening.
7      Q.   Okay.  So obviously the first thing you did is
8  you got out of your squad car, right?
9      A.   Yes.
10     Q.   And then you said something drew your
11 attention to the parking lot?
12     A.   Yes.
13     Q.   Could you be more specific?
14     A.   I don't recall what drew my attention to where
15 the fight was at.  A lot of times when we get on scene
16 people will point out, hey, over there, you know.  I
17 don't remember what that was, but something drew my
18 attention over to where the fight was happening.
19     Q.   And is --
20     A.   And I proceeded on foot to that location.
21     Q.   Is there anything that might help you remember
22 what it was that drew your attention to the parking lot?
23     A.   No, not that I can think of.
24     Q.   Now, when you arrived at Bottoms Up and you

Page 37

1  got out of your squad car, did you immediately take your
2  Taser out?
3      A.   No, not that I recall.
4      Q.   All right.  And you said something about you
5  ran over to the parking lot; is that right?  I don't
6  want to mischaracterize, so I think those were your
7  words.
8      A.   They were my words.  I believe I moved there
9  pretty quickly.
10     Q.   Okay.
11     A.   But I don't know if I ran or not exactly.
12     Q.   But you went there quickly?
13     A.   Yeah, I'd say I went quickly.
14     Q.   All right.  So as you're heading to the
15 parking lot, do you see any people?
16     A.   Once I got to that parking lot on the west
17 side, I did see people.
18     Q.   All right.  And how many people did you see
19 when you got to the parking lot?
20     A.   Approximately four people.
21     Q.   Men, women?
22     A.   Men.
23     Q.   How about the races; do you recall?
24     A.   I know there was one male black.

312 236 6930
877 653 6736
Fax 312 236 6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

McDowell vs Lansing
Michael Erasmo Rodriguez - 03/04/2013

Pages 38..41

Page 38

1    Q.    That being the other --
2    A.    I think --
3    Q.    -- Marlo McDowell?
4    A.    Yes.
5    Q.    Okay.  Who else?
6    A.    I believe the other gentlemen were male
7    whites, possibly male Hispanic after hearing the last
8    name of one of them, but I don't totally recall.
9    Q.    Do you recall what any of them were wearing?
10   A.    No.
11   Q.    When you first saw these individuals, where in
12   the parking lot were they located?
13   A.    They were near -- I'd say near the center of
14   that parking lot.
15   Q.    Are there any landmarks that you can say
16   within the parking lot that you can put them, they were
17   close to this or not as close to that, something like
18   that?
19   A.    Not that I can completely think of.  They
20   weren't far from the building.
21   Q.    When you say not far from the building, were
22   they less than 50 feet from the building?
23   A.    I'd say less.
24   Q.    Were there any cars in the parking lot?

Page 39

1    A.    I believe there were cars in the parking lot.
2    Q.    How many cars were in the parking lot?
3    A.    I don't know.
4    Q.    Anything that might help you remember?
5    A.    No, unless it's documented on Cook County
6    reports; but I didn't write those, so no.
7    Q.    And where were those four people in relation
8    to each other when you first saw them?
9    A.    They were in close proximity of each other.
10   Q.    And what were they doing?
11   A.    They were engaged in a physical altercation.
12   Q.    When you say they were engaged in a physical
13   altercation, can you just articulate for us what you
14   mean by that?
15   A.    I noticed a group of men engaged in a brawl,
16   fight.
17   Q.    What do you mean by brawl?
18   A.    I mean, like they were boxing each other.
19   Q.    Okay.  Was Marlo McDowell in your presence
20   punching anybody?
21   A.    He was in the group.  I don't know exactly who
22   was punching who.  It was a chaotic scene.
23   Q.    Did you see Marlo McDowell throw any punches?
24   A.    I don't recall.

Page 40

1    Q.    Anything that might help you remember?
2    A.    No.
3    Q.    Did you see anybody punch Marlo McDowell in
4    your presence?
5    A.    I don't recall.
6    Q.    Anything that might help you remember?
7    A.    No.
8    Q.    Did you see any of these other three men, not
9    including Marlo McDowell, throw any punches in your
10   presence?
11   A.    I believe so, but I don't recall specifically.
12   Q.    You couldn't say who was doing what?
13   A.    Exactly.
14   Q.    And did it seem to be three on one, two on
15   two?
16   A.    I was unable to determine who was -- who were
17   the enemy and who were friends with each other.
18   Q.    Okay.
19   A.    It was chaotic.
20   Q.    And were any of these people saying anything
21   when you first saw them?
22   A.    Not that I recall.
23   Q.    Does that mean they were not or does that mean
24   you don't remember either way?

Page 41

1    A.    I don't remember any verbal statements.
2    Q.    And how far were you from this group of people
3    when you first saw them?
4    A.    I would say approximately 15 to 20 feet.
5    Q.    Now, was your view of these people blocked
6    where you were first parking your car?
7    A.    Yes.
8    Q.    And what was your view of these people blocked
9    by?
10   A.    The building itself.
11   Q.    Okay.  So when you cleared the building is
12   when you first saw them?
13   A.    Yes.
14   Q.    And did you say anything once you saw those
15   people engaging in this altercation?
16   A.    I ordered them to the ground.
17   Q.    How did you do that?
18   A.    It was something to the effect of "get on the
19   ground."
20   Q.    And this was when you were 15 to 20 feet from
21   them?
22   A.    Yes.
23   Q.    And when you first saw these -- this group of
24   four people engaged in this altercation, did you stop or



Page 42

1    did you continue going in their direction?
2        A.   I stopped shortly after I saw them.
3        Q.   And did you draw any weapons?
4        A.   I had my Taser out.
5        Q.   Is that when you first saw them or immediately
6    thereafter?
7        A.   I don't recall exactly when I drew my Taser
8    out, but I know I had it in my hand.
9        Q.   Now, did you have it in your hand before or
10   after you issued your command?
11       A.   I don't recall.
12       Q.   Anything that might help you remember?
13       A.   No.
14       Q.   All right.  And did you contact dispatch once
15   you saw this group of people?
16       A.   I believe that I did.
17       Q.   Okay.  And what was the purpose of calling
18   dispatch at that point in time?
19       A.   If I did contact them it would just be to
20   verify there was in fact a fight happening.
21       Q.   And were there any other police officers on
22   scene that you were aware of when you first saw this
23   altercation with the four people?
24       A.   To my recollection, no.  After reading this

Page 43

1    dispatch it did say that there was a -- let me see how
2    it said it -- an off-duty officer there, but I don't
3    recall knowing that before I got there.
4        Q.   Would that be Ricky Ramirez?
5        A.   I believe so.
6        Q.   Okay.  I was talking about anybody from
7    Lansing or the Cook County Sheriff's Department.
8        A.   No, I was the only one present when I first
9    got there.
10       Q.   So as far as you knew, you were the only
11   on-duty uniformed officer when you first saw these
12   people in the altercation; is that correct?
13       A.   Yes.
14       Q.   And the command you said is you told them to
15   exactly just get on the ground?
16       A.   Get down on the ground.
17       Q.   And how many times did you issue that command?
18       A.   I don't recall how many times.
19       Q.   More than once?
20       A.   It was issued more than once for one subject
21   there.
22       Q.   So when you issued your first command for
23   everybody to get on the ground, did anybody comply at
24   that point?

Page 44

1        A.   Everybody complied except for one.
2        Q.   Was that Morandi?
3        A.   Yes.
4        Q.   All right.  So just to be clear, when you
5    issued the command for -- your initial command for these
6    people to get on the ground, Marlo McDowell got on the
7    ground; is that right?
8        A.   I don't recall how many times I said it before
9    everybody got down, but most of the guys except for
10   Morandi got down pretty quickly.
11       Q.   Okay.  So Marlo McDowell was one of the people
12   that got down?
13       A.   He was one of the ones that went down quickly,
14   yes.
15       Q.   And did you have your Taser directed at
16   anybody in particular?
17       A.   Mr. Morandi.
18       Q.   How about initially?
19       A.   In practice it would have been at like a low
20   ready, but I don't remember who I had it pointed at
21   before everyone went down.
22       Q.   When you said it's low ready, what do you mean
23   by that?
24       A.   It would have been not pointed at anybody,

Page 45

1    just pointed towards the ground.
2        Q.   Holding it in your hand and just pointing
3    it --
4        A.   Just had it ready in case I do need to go up
5    with it, but not necessarily pointed at anybody.
6        Q.   Okay.  Do you remember one way or the other
7    whether the first person you pointed it at was Marlo
8    McDowell?
9        A.   I don't recall.
10       Q.   Anything that might help you remember that?
11       A.   No.
12       Q.   And did you continue issuing commands after
13   the initial one of getting on the ground?  Well, let me
14   just do it this way.  You get there, you tell people to
15   get on the ground, three of the four get on the ground
16   immediately; is that right?
17       A.   Yes.
18       Q.   Okay.  What does Morandi do at that point?
19       A.   Morandi just was standing there.
20       Q.   Okay.  And Morandi when he was standing there,
21   where was he in relation to you?
22       A.   He was in front of me and I think his body was
23   just facing me -- it was facing near me.
24       Q.   Okay.  And how many feet was he from you at

312 236 6936
877 653 6736
Fax 312 236 6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Pages 46..49

Page 46

1    that point in time?
2        A.    Probably 15, 20 feet.
3        Q.    All right.  And were you standing still at
4    that point or were you closing in on Morandi?
5        A.    I believe I was standing still.
6        Q.    And where was McDowell at this point in time?
7        A.    From my recollection McDowell was on the
8    ground right next to Morandi.
9        Q.    And when you say McDowell was on the ground,
10   was he on his side, on his back, on his stomach?
11       A.    I couldn't say for sure.
12       Q.    You don't remember?
13       A.    Not for sure, no.
14       Q.    Anything that might help you remember?
15       A.    No.
16       Q.    And how about McDowell's hands, how were they
17   positioned when he was on the ground?
18       A.    I don't recall.
19       Q.    Anything that might help you remember?
20       A.    No.
21       Q.    And was McDowell saying anything when he was
22   on the ground?
23       A.    Not that I recall.
24       Q.    How about the other three people that

Page 47

1    were on -- Strike that.
2             How about the other two people, where were
3    they in relation to Morandi when Morandi is standing
4    there?
5        A.    From my recollection, the other two were to
6    the right of him.
7        Q.    And was McDowell to the left of Morandi or was
8    he also to the right of Morandi?
9        A.    From my recollection he was to the right.
10       Q.    So all three people were to the right of
11   Morandi?
12       A.    To my recollection.
13       Q.    And were they in a row one next to the other?
14       A.    From my recollection it was Morandi, McDowell
15   next to him, and then there was a little bit of a
16   distance and then the other two, I believe.
17       Q.    And when you say a little bit of a distance,
18   how much of a distance are we talking about?
19       A.    Maybe 10 or 15 feet.
20       Q.    Okay.  And then those other two were closer to
21   each other than they were to McDowell?
22       A.    I believe so, but I couldn't say exactly for
23   sure.
24       Q.    Those other two people that were on the

Page 48

1    ground -- I'm not talking about McDowell; do you
2    understand that?
3        A.    Yes.
4        Q.    (Continuing.) -- how were they positioned on
5    the ground?
6        A.    I don't recall.
7        Q.    Anything that might help you remember?
8        A.    No.
9        Q.    Were those other people saying anything while
10   they were on the ground?
11       A.    Not to my recollection.
12       Q.    Okay.  When those three people are on the
13   ground and Morandi is standing, did you hear or see a
14   woman in the parking lot?
15       A.    Not at -- I remember seeing a woman during the
16   incident.  I don't remember exactly when.
17       Q.    Would that be Noelle Folden?
18       A.    I don't know her name.
19       Q.    Could you describe what she looks like?
20       A.    She was a female black.  I believe she was
21   Mr. McDowell's girlfriend.
22       Q.    At some point you realize she was on the
23   scene?
24       A.    Yes.

Page 49

1        Q.    But you don't remember when you realized that?
2        A.    Yes.
3        Q.    And when you said that Morandi was positioned
4    to the left of McDowell, how far away was he from
5    McDowell?
6        A.    Very close.  Within touching distance.
7        Q.    So less than five feet?
8        A.    Yes.
9        Q.    And was Morandi positioned closer to
10   McDowell's legs, his center mass, or his head?
11       A.    I would say his head.
12       Q.    And did Morandi have his hands up -- Strike
13   that.
14            How were Morandi's hands positioned when he
15   was standing 15 to 20 feet in front of you?
16       A.    I don't recall his position of his hands.
17       Q.    Anything that might help you remember?
18       A.    No.
19       Q.    And as Morandi is standing after the other
20   three get on the ground, what do you do at that point?
21       A.    My attention is on Morandi and I'm issuing
22   commands continuously for him to get on the ground.
23       Q.    How many commands?
24       A.    Numerous, but I don't recall the exact amount.

JENSEN
Litigation Solutions

McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Page 50

1    Q.    And are you pointing the Taser at him?
2    A.    Yes.
3    Q.    And is the laser pointer functioning at that
4    point?
5    A.    I believe that it was.
6    Q.    Where was the laser pointer pointing?
7    A.    I don't recall the exact spot.
8    Q.    How about the general spot?
9    A.    More than likely center mass.
10   Q.    Meaning his chest or just below his chest?
11   A.    Yes.
12   Q.    And does Morandi respond in any way, whether
13   verbally or physically, to your commands for him to get
14   on the ground?
15   A.    Not at first.
16   Q.    Does he eventually respond?
17   A.    Yes.
18   Q.    Tell us what happens.
19   A.    When he did respond, he sat on the ground.
20   Q.    Did something happen before he responded?
21   A.    Yes.
22   Q.    What was that?
23   A.    He kicked Mr. McDowell.
24   Q.    Okay. All right. So just the time line of

Page 51

1    it, how long was Morandi standing in front of you before
2    he kicked McDowell?
3    A.    It was seconds. Probably about 10 seconds.
4    Q.    Okay. Now, in that 10 seconds, tell us
5    everything you did to try to make Morandi comply with
6    your commands.
7    A.    I had my Taser pointed at Mr. Morandi and I
8    was yelling to get on the ground, "get on the ground,
9    get on the ground."
10   Q.    And did he do anything at all to comply with
11   that before he kicked McDowell?
12   A.    No.
13   Q.    In that 10 seconds, tell us everything you
14   remember that you observed Morandi doing.
15   A.    From my recollection Morandi he was facing
16   towards my direction, he seemed drowsy, appeared -- you
17   know, from -- possibly from intoxication. I remember
18   his eyes were half open or appeared to make this
19   drowsiness -- to make him appear drowsy. That's all I
20   can remember. I don't know if he was looking at me or
21   not.
22   Q.    Were you focused completely on Morandi in that
23   time frame?
24   A.    Most of my attention was on Morandi, if not

Page 52

1    all of it.
2    Q.    And at the point in time that Morandi kicked
3    McDowell, at that point in time to your knowledge were
4    there any other uniformed police officers on scene?
5    A.    No.
6    Q.    And describe articulately for us exactly how
7    Morandi went about kicking McDowell.
8    A.    It was just one single swift kick. It was
9    just a kick, and from my recollection afterwards he just
10   faced my direction again right after the kick.
11   Q.    And did Morandi -- Where did Morandi kick
12   McDowell?
13   A.    It appeared to be the area of his head.
14   Q.    Which side of his head?
15   A.    I don't recall.
16   Q.    And which side of McDowell's body was closest
17   to Morandi; was it McDowell's right side of his body or
18   the left side of his body?
19   A.    I don't recall.
20   Q.    Anything that might help you remember that?
21   A.    No.
22   Q.    And if we're talking directionally, you said
23   that McDowell was to the right of Morandi at that point
24   in time; right?

Page 53

1    A.    From my memory.
2    Q.    And if we're talking directionally, north,
3    west, east, south, can you describe for us was he to the
4    north, to the west, to the east, or to the south of --
5    meaning was McDowell to the north of Morandi or to the
6    south of Morandi or west or east?
7    A.    Mr. McDowell would have been to the west of
8    Mr. Morandi.
9    Q.    Okay. And that means the other people that
10   were on the ground were also to the west of Morandi?
11   A.    Correct.
12   Q.    And geographically speaking again, where were
13   you in relation to Morandi?
14   A.    I was to the south of Mr. Morandi.
15   Q.    Okay. Were there any objects that were
16   obstructing your view of McDowell in that 10 seconds
17   before he was kicked?
18   A.    Not to my recollection.
19   Q.    Was there -- Were there any objects that were
20   obstructing your view of Morandi in those 10 seconds
21   while Morandi was standing there?
22   A.    Not to my recollection.
23   Q.    Now, if I understand, what you testified to
24   was that Morandi essentially turned and kicked McDowell


JENSEN
Litigation Solutions

McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Pages 54..57

Page 54

1  and then turned and faced you again; is that right?
2      A.  To my recollection.
3      Q.  Okay.  What's the very next thing that happens
4  after Morandi turns again and is now facing you?
5      A.  To my recollection I again screamed one last
6  time to get on the ground and then he complied.
7      Q.  Why didn't you tase him?
8      A.  I didn't tase him because I did not see him
9  assault Mr. McDowell again or that he was about to
10  assault him.
11      Q.  Now, when Morandi got on the ground, how did
12  he get on the ground?
13      A.  To my recollection he sat down Indian style
14  with his legs crossed.
15      Q.  Facing you?
16      A.  Yes.
17      Q.  And after he sat down, what's the very next
18  thing that happened?
19      A.  I waited for backup to arrive.
20      Q.  How much time after that did backup arrive?
21      A.  Probably about 40 seconds to a minute.
22      Q.  And was the first officer that arrived a Cook
23  County Sheriff's deputy or a Lansing officer?
24      A.  I don't remember that.

Page 55

1      Q.  Other Lansing officers did arrive at some
2  point?
3      A.  Yes.
4      Q.  Okay.  And then Cook County Sheriff's deputies
5  arrived as well; is that right?
6      A.  Yes.
7      Q.  Did you handcuff anybody before any other
8  officers arrived?
9      A.  Not that I recall.
10      Q.  From the time that Morandi got on the ground
11  Indian style until the time backup arrived, what are you
12  doing?
13      A.  To my recollection I'm just standing ground
14  just watching.
15      Q.  Issuing any further commands?
16      A.  Not that I recall.
17      Q.  Were you pointing your Taser at anybody?
18      A.  Not that I recall.
19      Q.  Had you put your Taser away?
20      A.  I don't recall.
21      Q.  After McDowell was kicked, what did you
22  observe about him?
23      A.  I'm sorry?
24      Q.  What did you observe about McDowell after he

Page 56

1  was kicked?
2      A.  I don't recall.
3      Q.  Well, when he was kicked or immediately
4  thereafter did he cry out in pain or do anything that
5  indicated that he was in pain?
6      A.  I believe he did indicate that he was in pain.
7  An ambulance was called.
8      Q.  I'm talking immediately at the time that he
9  was kicked or immediately thereafter.
10      A.  I don't remember if he said anything
11  immediately or not.
12      Q.  Do you know if he was still conscious after he
13  was kicked?
14      A.  I don't know if he had any slight
15  unconsciousness, but he was conscious for the incident
16  in its entirety that I recall.  I don't recall him ever
17  being unconscious.
18      Q.  Did you ever evaluate him to see if he was
19  conscious?
20      A.  I did not -- I did not evaluate him like a
21  physician would evaluate somebody, but I remember him
22  being conscious the entire time.  I don't remember any
23  unconsciousness.  He was talking.
24      Q.  Did you call for an ambulance as soon as you

Page 57

1  saw that McDowell was kicked in the face?
2      A.  I don't remember the timing of the ambulance
3  call.
4      Q.  You don't recall if it was immediately after
5  he was kicked?
6      A.  I don't recall the exact timing.
7      Q.  Did you ever call for an ambulance?
8      A.  Did I in this incident?
9      Q.  Yes.
10      A.  I believe I did.  I believe I was the one that
11  called it in.  Could I check here and see if it says?
12      Q.  Yeah, go ahead.
13      A.  It says Officer Hynek, 332, in Cook County
14  requested 1052.
15      Q.  1052 means what?
16      A.  Ambulance.
17      Q.  Officer who?
18      A.  332 is Officer Hynek.
19      Q.  That is a Lansing police officer?
20      A.  Yes.  It says him and Cook County requested
21  1052, which is an ambulance, for battery victim.
22      Q.  Who's Tyler Niven?
23      A.  He's a dispatcher.
24      Q.  So what you're looking at is the timing at

McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Page 58

1  4:26 and 24 seconds a.m. on June 25th 2011; is that
2  right?
3      A.   Yes.
4      Q.   Okay.  According to the Lansing dispatch
5  records, you did not ask for an ambulance; is that
6  correct?
7      A.   Yes.
8      Q.   Does that help refresh your memory as to
9  whether you requested an ambulance to dispatch?
10     A.   Yes.
11     Q.   And you did not; is that correct?
12     A.   I don't believe I did unless there's an error
13  on here.  I'm going to go by this.
14     Q.   Any particular reason why you did not call for
15  an ambulance even though you saw McDowell being kicked
16  in the face?
17     A.   Well, I did not see the -- I did not see
18  injury.  I didn't see exactly what -- I saw the general
19  kick, but I didn't see if he even made contact exactly
20  or how -- what the injuries may or may not have been.
21  So unless I had saw some serious injury myself,
22  typically would not call an ambulance on your own
23  without it being requested by the victim.
24     Q.   Who's Unit 151?

Page 59

1      A.   I believe that's probably a fire department
2  unit.
3      Q.   What does TOT Cook County mean?
4      A.   Turned over to Cook County.
5      Q.   Okay.  All right.  So in that 40 seconds from
6  the time that Morandi gets on the ground until the time
7  that backup arrives, what are the people on the ground
8  doing that you see?
9      A.   To my recollection they just remained
10  stationary on the ground.  There was no further
11  altercation.
12     Q.   And your testimony is in that time frame
13  McDowell is doing what?
14     A.   He's on the ground.
15     Q.   Doing what exactly?
16     A.   I don't recall.
17     Q.   So in that time frame, do you remember one way
18  or the other whether he was conscious or had lost
19  consciousness?
20     A.   I don't recall.
21     Q.   Anything that might help you remember?
22     A.   No.  I believe he was conscious, but ...
23     Q.   You don't remember for sure?
24     A.   Yeah.  There was a lot of people there, so I

Page 60

1  don't remember.
2      Q.   Talking that 40 seconds from the time Morandi
3  got on the ground until the backup arrives; you
4  understand that?
5      A.   Yes.
6      Q.   Okay.  In that 40 seconds, the black female,
7  is that when you first saw her; does that help jog your
8  memory?
9      A.   That sounds correct, but I don't remember
10  exactly when I first saw her.
11     Q.   At some point you did notice that she was
12  there, right?
13     A.   Yes.
14     Q.   Where was she when you first noticed her?
15     A.   She was in the parking lot.
16     Q.   Can you be more specific?
17     A.   I'm not exactly sure where in the parking lot.
18     Q.   Where was she in relation to the people that
19  were lying on the ground?
20     A.   I don't remember.
21     Q.   Was she lying on the ground?
22     A.   No.
23     Q.   Was she saying anything?
24     A.   Yes.

Page 61

1      Q.   What was she saying?
2      A.   I just recall that she was upset, but I don't
3  remember her statements.
4      Q.   What was she upset about?
5      A.   She was upset about her boyfriend.
6      Q.   Being kicked in the face?
7      A.   I don't remember exactly if it was for that,
8  but probably.
9      Q.   Well, tell us to the best of your memory what
10  you remember observing about her or hearing her say.
11     A.   I just remember that she was upset about the
12  incident that happened, but I couldn't tell you exact
13  statements.
14     Q.   And when you say upset, what do you mean by
15  that?
16     A.   That she was not -- she did not appear to be
17  happy with the circumstances.
18     Q.   Was she raising her voice; was she -- what
19  exactly do you mean by that, if you can tell us?
20     A.   I don't remember the volume of her voice.
21  From my recollection she just appeared to be upset,
22  saying something to the effect of her boyfriend was a
23  victim, you know, or something like that, but I don't
24  remember exactly.

McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Pages 62..65

Page 62

1    Q.   Anything else that you remember in relation to
2    her?
3    A.   No.
4    Q.   Can you tell us again exactly why is it that
5    you did not place Morandi in custody as soon as you saw
6    him kicking Morandi -- McDowell?
7    A.   Can you elaborate that.
8    Q.   You saw him commit a battery; is that right?
9    A.   Yes.
10   Q.   Okay.  That's a crime, right?
11   A.   Yes.
12   Q.   So when you saw him doing that, why didn't you
13   handcuff him?
14   A.   That would have been an officer safety issue.
15   I was the only one on scene and there was four
16   combatants.
17   Q.   At any point in time, did you place handcuffs
18   on Morandi?
19   A.   No, I don't believe so.
20   Q.   Why not?
21   A.   I believe another officer did.
22   Q.   All right.  So you said backup arrived after
23   about 40 seconds to a minute, right?
24   A.   Yes.

Page 63

1    Q.   When backup arrives where do they come from?
2    A.   They came from Lansing.  As far as their
3    direction of travel, I don't know for a fact.
4    Q.   I guess that was very poorly worded.  What I
5    mean is -- let's put it this way, when you first
6    realized that backup was there, how did you know that
7    backup was there?
8    A.   I saw other officers on scene.
9    Q.   Okay.  And where were they coming from; were
10   they coming from the same direction you left your squad
11   car or were they coming from different directions?
12   A.   I couldn't say for a fact.
13   Q.   And what happens when the first units arrive?
14   A.   I recall -- I recall at least one subject
15   being taken into custody, but I don't remember exactly
16   the order or who exactly did the handcuffing.
17   Q.   And was that subject that you recall Morandi
18   or was that somebody else?
19   A.   To my recollection I recall maybe Ramirez
20   being taken, but I don't ...
21   Q.   Ramirez was the off-duty cop?
22   A.   Yes.
23   Q.   And -- Well, let's take it back a notch.  So
24   when the arriving responding officers came, the

Page 64

1    backups -- okay, you understand?
2    A.   Yes.
3    Q.   (Continuing.) -- what's the first thing that
4    happens; did they come to you; did they go somewhere
5    else; do you say something to them; does anybody else
6    say something to them?
7    A.   I'm sure the situation was explained, but I
8    don't remember exact statement that I could tell you.
9    Q.   Did you explain anything to the responding
10   officers?
11   A.   I probably did, but I -- I don't recall who I
12   explained it to.  I think I talked to one of the Cook
13   County deputies.
14   Q.   Okay.  You recall speaking to a Cook County
15   deputy at some point in time?
16   A.   Yes.
17   Q.   What did that Cook County deputy look like?
18   A.   I don't recall for a fact.
19   Q.   Tell us to the best of your memory.
20   A.   I think maybe it was -- I think a female was
21   there -- a female officer, but -- possibly a male
22   deputy also.
23   Q.   How many Sheriff's deputies do you actually
24   recall being on scene?

Page 65

1    A.   I believe at least two.
2    Q.   Tell us to the best of your memory what you
3    relayed to them.
4    A.   I believe that I advised that one subject
5    kicked the other subject.
6    Q.   That Morandi kicked McDowell?
7    A.   Yes.
8    Q.   And when you relayed that information, was
9    Morandi in handcuffs yet?
10   A.   I don't recall.
11   Q.   Anything that might help you recall?
12   A.   No.
13   Q.   At some point McDowell was also placed in
14   handcuffs; is that correct?
15   A.   I don't recall that.
16   Q.   Anything that might help you remember that?
17   A.   No.
18   Q.   At some point ambulances arrived, right?
19   A.   Yes.
20   Q.   Okay.  So let's do it this way:  From the
21   point in time that your backup arrived until the time
22   that the ambulances arrived, in that time frame tell us
23   what you remember happening on scene.
24   A.   I think Cook County was sorting out what had

McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013                                                    Pages 66..69

Page 66

1  happened. They were conducting their investigation.
2      Q.  And what were you doing in that time frame?
3      A.  I was just in the area. I wasn't -- I think I
4  spoke a little bit to a Cook County Sheriff deputy and
5  that's about it.
6      Q.  Okay. So from the time that the backup units
7  arrived until the time the first ambulance arrived, in
8  that time frame the only thing you remember doing is
9  talking to one or more Sheriff's deputies; is that
10 right?
11     A.  Yes, and I believe I spoke to at least one
12 Lansing officer too.
13     Q.  Okay. And which officer was that?
14     A.  Probably Officer Hynek.
15     Q.  And why do you say probably Hynek?
16     A.  Because I'm recalling him being on scene and I
17 think I probably spoke with him, but I don't recall
18 exactly if I did or not. I probably did.
19     Q.  Anything that might help you jog your memory
20 as to whether you actually did speak to Officer Hynek?
21     A.  No.
22     Q.  Now, again, there's five people including you
23 on this incident report from Lansing as being listed as
24 having responded in some fashion. So looking at this,

Page 67

1  there's a Percak, a Yonker, Hynek, yourself, and Jones;
2  right?
3      A.  Yes.
4      Q.  You told us that you think that Hynek was
5  there and you think you might have spoken to him; is
6  that right?
7      A.  Yes.
8      Q.  How about the other three, Percak, Yonker, and
9  Jones, do you remember any of them actually arriving or
10 speaking to them on scene?
11     A.  No.
12     Q.  Do you think anything might help you remember
13 as to whether any of those officers arrived?
14     A.  The dispatch records.
15     Q.  Go ahead.
16     A.  Well, it indicates 332, Officer Hynek, as
17 being on scene since he requested the ambulance, but it
18 doesn't indicate whether the officers actually arrived
19 or not.
20     Q.  Okay. So this does not help you remember if
21 any of those other officers arrived; is that correct?
22     A.  No. I believe that they were there, but I
23 don't specifically remember their presence. I somewhat
24 remember Officer Jones being there.

Page 68

1      Q.  Is that a male or female?
2      A.  Male.
3      Q.  What's his name -- first name?
4      A.  Michael Jones.
5      Q.  And from what you remember of Michael Jones
6  being on the scene, what was he doing?
7      A.  I just remember him standing there on scene.
8      Q.  Okay. So from the time that the backup units
9  arrived until the ambulance arrived, in that time frame
10 what was the female -- the black female doing, if you
11 remember?
12     A.  I don't remember.
13     Q.  From the time that the backup units arrived
14 until the ambulance arrived, in that time frame tell us
15 everything you remember observing about Marlo McDowell.
16     A.  I think that he was complaining about his
17 injury.
18     Q.  Can you be more specific?
19     A.  No.
20     Q.  Do you remember where he was located or how he
21 was positioned in that time frame?
22     A.  No.
23     Q.  And how far were you from him in that time
24 frame?

Page 69

1      A.  I don't know exactly.
2      Q.  Did you walk further away from him or did you
3  get closer to him than that initial 15 to 20 feet that
4  you were from him?
5      A.  I think that I was within a close range of him
6  maybe when he was going into the ambulance or around
7  that time. I seem to recall being kind of near him.
8      Q.  Okay. What did you observe about him at that
9  point?
10     A.  Nothing of note.
11     Q.  Did he appear to be in pain?
12     A.  I don't remember if he appeared to be in pain
13 or if he was just complaining of the injury.
14     Q.  And the nature of his complaints, there's
15 nothing you remember specifically about what those were;
16 is that correct?
17     A.  Not specifically, no. I think he was
18 indicating his head or jaw.
19     Q.  Okay. Beyond that, you don't remember?
20     A.  No.
21     Q.  And how about the other three people that were
22 initially involved in the fight, from the time that the
23 responding officers arrived until the time that the
24 ambulance arrived, in that time frame what were those

Case: 1:12-cv-05025 Document #: 32-5 Filed: 07/29/13 Page 21 of 30 PageID #:172

McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Pages 70..73

Page 70

1 other three people doing, that includes Morandi; right?
2    A.   I don't recall.
3    Q.   Do you remember anything about what Morandi
4 was doing or where he was located from the time that the
5 responding officers arrived until the time that the
6 first ambulance arrived?
7    A.   Can you repeat that.
8    Q.   Yeah. The first responding officers arrived
9 you told us 40 seconds to a minute after Morandi gets on
10 the ground. From that point in time until the time that
11 the first ambulance comes on scene, in that time frame
12 tell us everything you remember Morandi doing or saying.
13    A.   I don't recall.
14    Q.   Anything that might help you remember?
15    A.   No.
16    Q.   How many ambulances eventually came on the
17 scene?
18    A.   I remember one.
19    Q.   And that's the one that tended to Marlo
20 McDowell?
21    A.   Yes.
22    Q.   And you said you recall him being taken into
23 the ambulance; is that right?
24    A.   Yes.

Page 71

1    Q.   Did he go into the ambulance of his own power
2 or was he wheeled in on a stretcher?
3    A.   I don't remember.
4    Q.   Anything that might help you remember?
5    A.   No. It may be documented in the ambulance
6 report.
7    Q.   Did you have any conversations at all with the
8 paramedics that arrived on scene?
9    A.   Not to my recollection.
10    Q.   And did you see what, if anything, the
11 paramedics were doing in treating Marlo McDowell?
12    A.   Not specifically.
13    Q.   How about generally?
14    A.   I know that they were treating him, but that's
15 about it. I don't know exactly what they were doing to
16 treat him.
17    Q.   And when the paramedics were treating Marlo
18 McDowell, where was this black female?
19    A.   I don't know her exact location.
20    Q.   Okay. And after McDowell was placed into the
21 ambulance, did the ambulance leave?
22    A.   I believe that it left at some point, yes.
23    Q.   Were you still on scene when the ambulance had
24 left?

Page 72

1    A.   I don't remember.
2    Q.   At what point in time did you leave the scene?
3    A.   I don't remember the exact time.
4    Q.   How long were you on the scene?
5    A.   Probably approximately 20, 25 minutes.
6    Q.   Were there any other police officers that were
7 left on the scene after you left?
8    A.   I don't remember.
9    Q.   Anything that might help you remember?
10    A.   No.
11    Q.   Was anybody placed in handcuffs besides
12 Morandi? Well, I don't think you told us specifically.
13 Was Morandi placed in handcuffs when you were still
14 there?
15    A.   I don't -- I don't recall him being placed in
16 handcuffs.
17    Q.   Does that mean he was not?
18    A.   That doesn't mean he wasn't, but I don't know.
19    Q.   You don't remember either way?
20    A.   I don't remember. I think we left it up to
21 Cook County what they wanted to do.
22    Q.   Was the investigation still ongoing when you
23 left?
24    A.   I don't recall.

Page 73

1    Q.   What did you do next after you left?
2    A.   I don't remember.
3    Q.   When's the next time you had anything to do
4 with this incident?
5    A.   When I went to trial.
6    Q.   Did you have any contact with any State's
7 attorneys prior to you going to trial to testify in
8 relation to this incident?
9    A.   I believe so, yes.
10    Q.   Were you subpoenaed?
11    A.   I was summoned or subpoenaed.
12    Q.   And when you say you had contact with the
13 State's attorneys, was that -- did you go to regular
14 court appearances or did you just show up the one time
15 when it was time to testify?
16    A.   I don't remember how many times I went for it,
17 but any contact with the State's attorney would have
18 mainly been to prep for the incident -- for the trial.
19    Q.   Which courthouse was the trial at?
20    A.   Markham.
21    Q.   Have we exhausted your memory of what you
22 observed of Marlo McDowell?
23    A.   Yes.
24    Q.   And what Marlo McDowell was doing or saying?

312 236 6936
877 653 6736
fax 312 236 6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Page 74

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Anything that might help refresh your memory |
| 3 | on those topics? | |
| 4 | A. | No. |
| 5 | Q. | Have we now exhausted your memory of your |
| 6 | observations of Stephen Morandi? | |
| 7 | A. | Yes. |
| 8 | Q. | And what he was doing? |
| 9 | A. | Yes. |
| 10 | Q. | And where he was located at various points in |
| 11 | time? | |
| 12 | A. | Yes. |
| 13 | Q. | Anything that might help refresh your memory |
| 14 | on those topics? | |
| 15 | A. | No. |
| 16 | Q. | Have we exhausted your memory with respect to |
| 17 | all the other people that you saw in the parking lot | |
| 18 | that were involved in this fight? | |
| 19 | A. | Yes. |
| 20 | Q. | And what they were doing or saying? |
| 21 | A. | Yes. |
| 22 | Q. | Anything that might help refresh your memory |
| 23 | on those topics? | |
| 24 | A. | No. |

Page 75

1    Q.   Have we exhausted your memory with respect to
2  this black female what was in the parking lot?
3    A.   Yes.
4    Q.   And what she was saying or doing in your
5  presence?
6    A.   Yes.
7    Q.   Anything that might help refresh your memory
8  on those topics?
9    A.   No.
10   Q.   Have we now completely exhausted your memory
11  with respect to this incident?
12   MR. MATHEWS:  I object to the overbroad nature of
13  the question.
14  BY MR. FOUTRIS:
15   Q.   You can still answer.
16   A.   I take my attorney's advice.
17   Q.   What does that mean?
18   MR. MATHEWS:  You can answer the question.
19   THE WITNESS:  Are you objecting to it?
20   MR. MATHEWS:  That was just a lawyer.
21   THE WITNESS:  Oh, okay.
22  BY MR. FOUTRIS:
23   Q.   In other words, have you told us everything
24  you remember happening at the scene of the incident?

Page 76

1    A.   Yes.
2    Q.   And do you think there's anything else that
3  might help you remember anything in addition to what
4  you've told us today?
5    A.   No.
6    MR. FOUTRIS:  Okay.  Greg, do you have anything?
7    MR. MATHEWS:  No questions.
8    MR. FOUTRIS:  Reserve or waive?
9    MR. MATHEWS:  Waive.
10            (Witness excused.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 77

1  UNITED STATES OF AMERICA          )
   NORTHERN DISTRICT OF ILLINOIS     )
2  EASTERN DIVISION                  )  SS
   STATE OF ILLINOIS                 )
3  COUNTY OF COOK                    )

4

5        I, Kathy J  Szotek, Certified Shorthand

6  Reporter and Notary Public, do hereby certify that

7  MICHAEL ERASMO RODRIGUEZ was first duly sworn by me to

8  testify to the whole truth and that the above deposition

9  was reported stenographically by me and reduced to

10 typewriting under my personal direction.

11       I further certify that the said deposition was

12 taken at the time and place specified and that the

13 taking of said deposition commenced on March 4, 2013, at

14 1 19 p.m

15       I further certify that I am not a relative or

16 employee or attorney or counsel of any of the parties,

17 nor a relative or employee of such attorney or counsel,

18 nor financially interested directly or indirectly in

19 this action

20

21

22

23

24


JENSEN
Litigation Solutions

McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Page 78

1            In witness whereof, I have hereunto set my
2      hand and affixed my seal of office at Chicago, Illinois,
3      this 25th day of July, A.D , 2013.
4
5
6
7
8
9
10              KATHY J  SZOTEK, CSR
                180 North LaSalle Street
11              Suite 2800
                Chicago, Illinois 60601
12              Phone   (312) 236-6936
13
14
       CSR No   084-004657
15
16
17
18
19
20
21
22
23
24



McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Index: 1..camera

**1**

1  7:1,4 12:10
10  47:19 51:3,4,13
   53:16,20
10-page  7:5
1052  57:14,15,21
11  7:22 8:17
11:00  27:23
15  41:4,20 46:2 47:19
   49:15 69:3
15-foot  25:2
151  58:24

**2**

2  8 11,12 12:11,13
   13:16,18
2-4  12:6
20  41:4,20 46:2 49:15
   69:3 72:5
2002  8:7
2006  5:6,8,9
2007  5 4 26:22
2011  9:1 10:22 11:4
   17:24 26:9 27 5,21,24
   58:1
20s  15:21,24
24  58:1
24th  27:24
25  11:4 25:3 72:5
25-  25:2
25th  10:22 17:23 26:9
   27:5,21 58:1

**3**

3  12:17,21 13:16,18
332  57.13,18 67:16
35-foot  25:2

**4**

4  12:19,22 13:16
40  54:21 59:5 60:2,6
   62:23 70:9
4:26  58:1

**5**

50  38:22

**6**

6  8:13 12:23

**7**

7:00  28 4
7:30  28:6

**A**

a.m.  28:4 58.1
ability  34:4
academy  26:18
accurate  8:4
acknowledge  30:10
action  28:9
activate  20:15,19,22
   21:1
activating  20:5,18
active  18:18
added  8:14
addition  31:18 76:3
additional  10:10
advice  75:16
advised  65:4
agencies  5:17 10:19
ahead  25:11 35.5
   57:12 67:15
air  34:21

allegations  6.12 8:24
alleged  7:23
alleging  8:18
allowed  9:23
altercation  39:11,13
   41:15,24 42:23 43:12
   59:11
ambulance  56:7,24
   57.2,7,16,21 58:5,9,
   15,22 66:7 67:17 68:9,
   14 69.6,24 70:6,11,23
   71:1,5,21,23
ambulances  65 18,
   22 70:16
amended  7:19
amount  49:24
ancillary  6 8
angle  33:5
answers  4:19 7:6 8:3
   11:24
appearance  16:2
appearances  73:14
appeared  51.16,18
   52:13 61:21 69:12
Apple  5:11
approximately  37:20
   41:4 72:5
area  28:17 33:1 52:13
   66:3
arrest  9:2,7
arrested  6:13 28:8
arresting  9:6 28:5
arrive  54:19,20 55:1
   63:13
arrived  32:21 34:8,
   35:23 36:24 54:22
   55:5,8,11 62.22 65:18,
   21,22 66:7 67:13,18,
   21 68:9,13,14 69:23,
   24 70.5,6, 71:8
arrives  59:7 60:3 63 1
arriving  63:24 67:9
articulate  39:13

articulately  52:6
assault  54:9,10
assigned  19:8,10,13
assignment  18:3
   30:16
assignments  10:3
assisting  14:3
ATF  10:20
attached  28:1
attention  36:2,11,14,
   18,22 49:21 51 24
attorney  11:21 73:17
attorney's  75:16
attorneys  15:10 73:7,
   13
audio  21:7
author  13:12
authored  14:9
automatic  18:24
automatically  20:19
aware  14:23 42:22

**B**

back  20:22 46:10
   63.23
backup  54:19,20
   55:11 59:7 60:3 62:22
   63:1,6,7 65 21 66:6
   68:8,13
backups  64:1
badge  18:9
ballpark  26:6,7
Bates-stamped
   12:11,19,23
battery  32:7 57:21
   62:8
beat  30:14,16,18,19,
   21 31:4
beats  30:17,22
began  7:18 32:11

beginning  22:7
begun  27:24
bell  14:12
belt  9:24
Birkenfeld  11:1,2
   14:22
Birkenfeld's  15.6
bit  12.1 28:24 47:15,
   17 66:4
black  15:19 29:23
   37:24 48:20 60:6
   68:10 71:18 75.2
blocked  41:5,8
blue  18:8,9,10
body  45:22 52:16,17,
   18
bottom  25:8
Bottoms  14:15 28:13
   29:5,13 32:11,18 33:7
   34:16,23 35:16,19,22
   36:24
boxing  39.18
boyfriend  61:5,22
brawl  39:15,17
briefly  5.11
broken  11:15
brought  16:20
building  33:12 38:20,
   21,22 41.10,11
button  20:15 21:1,3

**C**

cage  19:20,21,23
call  5:15 30:12 56:24
   57:3,7 58:14,22
called  4:4 23:19 35:10
   56:7 57:11
calling  35:7 42:17
camera  18:14,17
   19:2,16,19,24 20:12,
   19,22 21·4,8,18,19,21
   22:7 23:2,23 24:2,12



McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Index: car..evaluate

33:19,23 34:2,5

car 6:14 18:12,14,17
19:2,8,12,13,14,15,16,
19,24 20:1,12,21 21:8,
17 22:6,15,21 23:2,22
24:2 30:20 32:13 33:2,
19,22 34:2,14 36:8
37:1 41:6 63:11

cars 19.10 31:1 38:24
39:1,2

case 6:5,9,12 11:9
15:2,7,10 16:6 45:4

cell 9:23

center 21:13,14 38:13
49:10 50:9

certified 25:18 26:9,
16

change 7:19

chaotic 39:22 40:19

charge 32:3,4

check 22:6,15,18
24:14 57:11

chest 50:10

circumstances
61:17

citywide 30:15

claiming 9 7

claims 11:9

class 10:14 26:18

clear 13:15,18 44:4

cleared 41:11

clip 20:10

close 38:17 39:9 49 6
69 5

closer 47:20 49:9
69:3

closest 52:16

closing 46:4

clothing 8:8

college 5:9

combatants 62:16

command 42:10
43:14,17,22 44:5

commands 45:12
49:22,23 50:13 51:6
55:15

commit 62:8

complaining 68:16
69:13

complaint 9:11

complaints 7:23 8:18
9:2,16 69:14

completely 38:19
51:22 75:10

compliance 6:15

complied 44.1 54.6

comply 43:23 51:5,10

conducting 66:1

connection 6:2 9:19
13:12 15:10 23:22

conscious 56:12,15,
19,22 59:18,22

consciousness
59:19

contact 34:22 42:14,
58:19 73:6,12,17

contacted 15 9

continue 15:23 42:1
45:12

Continuing 48 4 64:3

continuously 49 22

conversation 17:6

conversations 71:7

convicted 15:4

Cook 12:1,10,18 13:7
14:1,4 39:5 43:7 54:22
55:4 57:13,20 59:3,4
64:12,14,17 65:24
66:4 72:21

cop 63:21

correct 5:6 6:3 7:24
27:5 28:20,21 30:4
33:21 43:12 53:11
58.6,11 60:9 65:14
67 21 69:16

Correction 28:6

County 12:2,10,18
13:7 14:1,4 39:5 43:7
54:23 55:4 57:13,20
59:3,4 64:13,14,17
65:24 66:4 72 21

court 4:11 11:5 73:14

courthouse 73 19

courtroom 16.12
17:2

cousin 5:22

coworkers 6:14

creating 13:20

crime 62:10

criminal 16:5 17:4

crossed 54:14

cry 56.4

custody 27:4,10,13,
15 62:5 63:15

D

D1 12:11

D3 12:19

D5 12:23

D6 30:3

dark 18:8,10

date 14:18 15:13 16:5
18:1 19.6,13,15 20:1
24:8 25:19,22 26:4
27:7 31:9

day 18:3 24:17 30:16

DEA 10:20

defendant 6:9

defendant's 7:5

define 27:9,12

department 9:3 10:4
12:11,19 13:8,19
22:13 43:7 59.1

depending 25.13
31:2

depends 19:10

deployed 25:8,9,21
26:3

deposition 4:18 7:1,
17 11:20 12:5

deputies 14:15 55:4
64:13,23 66:9

deputy 14:5,17 54:23
64:15,17,22 66:4

describe 18:7 48:19
52:6 53:3

description 29:24

descriptions 30:9
34:20

detained 27:7,10,14,
17

detective 8:13 10:4,9

determine 40:16

diagonal 33:8

digital 19:2 21:16

direct 4:6 31:8

directed 44:15

direction 33:2 36:5
42:1 51:16 52:10 63:3,
10

directionally 52:22
53:2

directions 63:11

disciplined 9:19

discussing 15:4

dispatch 29:6,7,11,19
30:6,10 32:7,10 34:18,
19,22 35:16 42:14,18
43:1 58 4,9 67:14

dispatched 30:12

dispatcher 57:23

distance 25:14,
47:16,17,18 49:6

dock 22:21

document 7:5 8:3
23:6,7,9 31:11

documented 71:5

documenting 35:7

documents 11:17,22
13:3,20 26:14 28:23

Donald 11:2

dot 25:16

draw 42:3

drew 36:2,10,14,17,22
42:7

drive 32:17

drove 32:13

drowsiness 51:19

drowsy 51:16,19

duly 4:4

duties 6:2 9:20

duty 17:24 27:22

E

E-mailed 7:13

east 53:3,4,6

effect 22:1 41:18
61:22

elaborate 62:7

emergency 18:23
20:13 33 17

employed 4:14

employee 8:9 10:8

end 23 11 28:3

enemy 40:17

enforcement 5:17,20
10:17

engaged 39:11,12,15
41:24

engaging 41:15

entire 56:22

entirety 56:16

entrance 33:1,7 35:20

Epting 6:5

Erasmo 4 3,10

error 58:12

essentially 53 24

et al 6:6

evaluate 56:18,20,21



Case: 1:12-cv-05025 Document #: 32-5 Filed: 07/29/13 Page 26 of 30 PageID #:177

McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Index: eventually..khaki

eventually 32:18 70:16

exact 19:5 32:8 49:24 50:7 57:6 61:12 64:8 71:19 72:3

EXAMINATION 4:6

examined 4:5

excluded 16:19,20

excused 76:10

exercises 25:22 26:1

exhausted 73:21 74:5,16 75:1,10

exhibit 6:23 7:1,4 12.5,9,13,17,21,22

exhibits 12:4,9 13:16, 18

expedited 32:16,17

explain 23:6 64:9

explained 64:7,12

extra 30:20

eyes 51 18

F

face 57:1 58:16 61:6

faced 52:10 54.1

facing 45:23 51:15 54:4,15

fact 15:3,5 16:3,24 35:3 42:20 63 3,12 64:18

false 9:7

familiar 28:17

fashion 66:24

fashioned 19:3

fast 32:14,16

feet 38:22 41:4,20 45:24 46:2 47:19 49:7, 15 69:3

female 48:20 60:6 64:20,21 68:1,10 71:18 75:2

field 24:15 26:4

fight 29:12 30:8 36:15, 18 39:16 42:20 69:22 74:18

filed 8:18

fill 23:3

fire 59:1

float 30·18,19

floater 31:5

focused 51:22

Folden 11:1 48:17

foot 36:20

footage 22:13

forward 21.12

FOUTRIS 4:7 6:23 7:3,15,16 12.3,7, 75:14,22 76:6,8

frame 51:23 59 12,17 65:22 66:2,8 68:9,14, 21, 69:24 70:11

freedom 27:12,18

friends 40:17

front 7:7 12:12,20,24 13:3 14 10 15:14 19:18 21:9,11 28:23 31:11 33·1,6 35:19,20 45:22 49:15 51:1

FTO 10:5,6,8

full 4:8

fully 4:21 30:24

functioning 24:14,19 33:20 50:3

G

gain 6 15

general 50:8 58:18

generally 71:13

gentlemen 38:6

geographically 53:12

girlfriend 48:21

give 4:17,18 26:6

graduated 5·5

graduating 5:9

greater 25:16,17

Greg 76:6

ground 4:17 41:16,19 43:15,16,23 44:6,7 45:1,13,15 46.8,9,17, 22 48:1,5,10,13 49:20, 22 50:14,19 51:8,9 53:10 54:6,11,12 55.10,13 59:6,7,10,14 60:3,19,21 70:10

group 39:15,21 41·2, 23 42:15

groups 10:17

guess 16:24 63.4

guessing 16:21 21:10

guys 44:9

H

hair 16:4

half 28:7 35:17 51·18

hand 42:8,9 45:2

handcuff 55·7 62:13

handcuffing 63:16

handcuffs 62:17 65:9,14 72:11,13,16

handed 7:4 12:8

hands 46:16 49:12, 14,16

happen 50:20

happened 9:11 15:1, 7 54:18 61:12 66:1

happening 36 6,18 42.20 65:23 75:24

happy 61:17

head 49:10,11 52:13, 14 69:18

heading 37:14

hear 48:13

heard 11:10,15,16 28.12 32:6,9

hearing 38:7 61:10

height 15:13

helps 31:12

hey 36:16

Hispanic 38:7

hit 25:15

hitting 20:14

Holding 45:2

hospital 17 11,15

hours 28:7

Hynek 31:17 57:13,18 66:14,15,20 67:1,4,16

hypothetical 25:11

hypothetically 20:20

I

identify 12:9

Illinois 5:5

immediately 37:1 42:5 45:16 56:3,8,9,11 57:4

in-house 29:8,10

incident 12:10,18,22 13:10,13,19,23,24 14:9,21 17:8,12 24:18, 23 30:2 31:15 36:5 48:16 56:15 57:8 61:12 66:23 73:4,8,18 75:11,24

includes 70:1

including 40:9 66:22

incomplete 25:10

Indian 54:13 55.11

indicating 11:23 23:3 69:18

individuals 38:11

inform 34:22

information 11:13 34:17 65:8

informed 7:18

initial 26:17 34:18 44:5 45:13 69:3

initially 44:18 69:22

injuries 11:9 58:20

injury 11:10,14 58:18, 21 68:17 69:13

inside 22:21

instance 20:20

interact 11.4 16:6

interacted 10:23

interrogatories 6:21 7:6,20 8:4 11:24

interrupt 15:22

intoxication 51:17

investigation 66:1 72:22

involved 9:8 69:22 74:18

involving 28:13 29:5

iphone 5:13

issue 43 17 62:14

issued 42:10 43:20,22 44:5

issuing 45:12 49:21 55:15

J

jaw 11:11,14,15 69.18

jog 28:23 30:5 31:12 60:7 66:19

Jones 31:17 67:1,9,24 68:4,5

July 5:4

jumped 29 21

June 10:22 11:4 17:23 26:9 27:5,21,24 58:1

jurisdiction 14:1,2

K

khaki 29:23



JENSEN
Litigation Solutions

McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Index: kick .park

kick 52:8,9,10,11
58:19

kicked 27:16 50:23
51:2,11 52:2 53:17,24
55:21 56:1,3,9,13
57:1,5 58:15 61:6
65:5,6

kicking 52:7 62:6

kind 13:23 17:6 21:15
23:3,6 69:7

knew 29:14 43:10

knowing 43:3

knowledge 8:5 10:22
17:14,16,18 19:17
52:3

_____

L

landmarks 38:15

Lansing 4:14 5:3,10
6:2,6 9:20 12:23
13:10,24 17:14,24
26:13 27:2 28:19 29:7
30:2,22 43:7 54:23
55:1 57:19 58:4 63:2
66:12,23

laptop 21:22

laser 24:19,22 25:7
50:3,6

law 5:16,19

lawsuits 6:20

lawyer 75:20

learn 29:4,11

learned 30:6 34:18

leave 23:12,15 71:21
72:2

left 5:15 47:7 49:4
52:18 63:10 71:22,24
72:7,20,23 73:1

legs 49:10 54:14

lieutenant 32:5

lights 18:18,19,21,22,
23 20:13 32:15,16
33:15,17,24 34:1,5,8

listed 66 23

listen 16:18

Listening 16:16

loaned 10:19

located 17:12 21:9
38:12 68:20 70:4
74:10

location 28:15 32:8
33:7,13 36:20 71:19

long 35:15 51:1 72:4

looked 15:12

lost 59:18

lot 29:22 33:11,13
36:3,11,15,22 37:5,15,
16,19 38:12,14,16,24
39:1,2 48:14 59:24
60:15, 74:17 75:2

low 44:19,22

lying 60:19,21

_____

M

made 9:2 58:19

make 51 5,18,19

male 15:19 29:23,
37:24 38:6,7 64:21
68:1,2

manually 20:14 34:4

mark 6:23 12:3

marked 7:2 12:6
18:12

Markham 73:20

Marlo 10:23 15:16
16:7 27:15 38:3 39:19,
23 40:3,9 44:6,11 45:7
68:15 70:19 71.11,17
73:22,24

Mars 18:19,21 20.13

mass 49:10 50:9

MATHEWS 12:13
25:10 75:12,18,20
76:7,9

Mcdowell 10:23
15:16,17 16:7,21 17:3,
7,12,17 27:15 38:3
39:19,23 40:3,9 44:6,

11 45:8 46:6,7,9,21
47:7,14,21 48:1 49 4,5
50:23 51:2,11 52:3,7,
12,23 53:5,7,16,24
54:9 55:21,24 57.1
58:15 59:13 65:6,13
68:15 70.20 71:11,18,
20 73:22,24

Mcdowell's 46:16
48:21 49:10 52:16,17

MDT 21:23

meaning 30:19,21
50:10 53:5

means 53:9 57:15

meant 12.14

MEG 10:15,16,17

memory 23 21,24
25:6 28:24 30:5 31:12
34:3 35:12 53:1 60:8
61:9 64:19 65:2 66:19
73:21 74:2,5,13,16,22
75:1,7,10

men 37:21,22 39:15
40:8

metropolltan 10:17

Michael 4:3,10 68:4,5

microphone 20:1,4,
16,18,19,23 21:6
22:17,20 23:2

midnight 18:8

midnights 31:6

mike 21.5

military 5:23

minimum 31:2,6

minute 35:17 54:21
62.23 70 9

minutes 72:5

mischaracterize
37:6

misconduct 7:23
8:18 9:16

model 24:10

Morandi 11:2 14:22
16:6 17:4 44:2,10,17
45:18,19,20 46 4,8

47:3,7,8,11,14 48:13
49:3,9,12,19,21 50:12
51:1,5,7,14,15,22,24
52:2,7,11,17,23 53:5,
6,8,10,13,14,20,21,24
54:4,11 55:10 59:6
60:2 62:5,6,18 63:17
65:6,9 70:1,3,9, 72:12,
13 74:6

Morandi's 14:24
49:14

Morgan 14:5,6,7

mounted 21:10,19

moved 37:8

movement 27:13,18

_____

N

named 9:5

nature 8:23 69:14
75:12

necessarily 45:5

night 27:23

Niven 57.22

Noelle 11:1 48 17

north 53:2,4,5

northwest 33:4

Nos 12:6

notch 63:23

note 69:10

notice 23:1 60:11

noticed 39:15 60:14

Numerous 49 24

_____

O

object 25:10 75:12

objecting 75:19

objects 53:15,19

observations 74:6

observe 55:22,24
69.8

observed 51:14

73:22

observing 61:10
68:15

obstructing 53:16,20

occurred 13:24

off-duty 29:22 43:2
63:21

offense 12:17

office 15:10

officer 5:15 6:2 7:18
9:6,20 10:4 12:8 14:3
17:24 18:4 27:9 29:22
32:2,4,21 43:2,11
54:22,23 57:13,17,18,
19 62:14, 64:21 66.12,
13,14,20 67:16,24

officers 31:7,24 42.21
52:4 55:1, 63:8,24
64:10 67:13,18,21
69:23 70:5,8 72:6

officially 10:8 11:16

on-duty 43:11

ongoing 72.22

open 51:18

operate 18:17

operational 19:11

order 23:8,9,19,20,22
24:1 63:16

ordered 41:16

organization 29:9

overbroad 75:12

_____

P

p.m. 27:23

pain 56:4,5,6 69:11,12

pants 18:10

paperwork 23:3

paramedics 71:8,11,
17

Pardon 18:20

park 32:24



McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Index: parked..rodriguez

parked 33:1 35:19

parking 29:22 33:10, 13 36:2,11,22 37:5,15, 16,19 38:12,14,16,24 39:1,2 41:6 48:14 60:15, 74:17 75:2

part 10:15 22:14

part-time 8:9

partial 10.7

patrol 18:4 31:6,24 32:13

PDT 21:23

people 11:5 16:18 27:4,7 31:20 35:22 36:16 37:15,17,18,20 39:7 40:20 41:2,5,8, 15,24 42:15,23 43:12 44:6,11 45:14 46:24 47·2,10,24 48:9,12 53:9 59:7,24 60:18 66 22 69:21 70.1 74:17

Percak 31:15 67:1,8

person 20:2,8,9 45:7

personnel 31·15

physical 39.11,12

physically 50:13

physician 56:21

place 20:2 22:20 62:5, 17

plaintiff 15:12,15

plaintiff's 11:8

point 17:3 25:7 28:12 29.15 36:16 42:18 43:24 45:18 46.1,4,6 48:22 49.20 50:4 52:2, 3,23 55:2 60:11 62:17 64:15 65:13,18,21 69:9 70:10 71:22 72:2

pointed 44:20,24 45:1,5, 51:7

pointer 24:20,22 25:7 50:3,6

pointing 19:23 21:11 33:3,4,6,10,12,14 36:4 45:2 50:1,6 55:17

points 19:18 74:10

police 4:14 5:15 6:2 7:23 8:18 9:3,20 10:3 13:19 14:4 17:24 22:12 26:18 28:9 29:8 42:21 52:4 57:19 72:6

pool 19:13

poorly 63:4

portion 30:2

position 49:16

positioned 46:17 48:4 49:3,9,14 68.21

possibly 32.17 38:7 51:17 64:21

power 71:1

practice 22:22 24:16 34 24 44:19

preferably 23:15

prep 73:18

prepare 11:19 13:22

preparing 23 21

presence 39:19 40:4, 10 67:23 75 5

present 6:17,19 43:8

pretty 37:9 44:10

prior 10.22 24:17 25:18,21 26:4,9 27:5, 7,16 73:7

probationary 26:17

probes 25:17

proceeded 36:20

proceedings 11:5

progress 29:13 30:8 32:7

prong 25:8

prongs 25:1,2

pronounced 31:16

prosecutions 14:20

protocol 22:14

proximity 39:9

PTI 26:20,21

punch 40:3

punches 39:23 40:9

punching 39:20,22

purpose 42:17

push 21:1

pushing 21:2

put 33:15 38:16 55:19 63:5

putting 19 4

_____

Q

question 4:21,24 7:22 8·2 75·13,18

questions 76:7

quick 4:17 6:24 17:20

quickly 37:9,12,13 44:10,13

_____

R

race 15:13

races 37:23

raising 61:18

Ramirez 11 2 43·4 63:19,21

ran 34:14 37 5,11

range 69:5

reading 30:2 31:18 42:24

ready 44:20,22 45:4

real 6:24

realize 48:22

realized 49:1 63:6

reason 19:11 34·13 58:14

recall 14:19 15:11,12, 19,20 17:5,10 20:5 22:2,8,10 24:17 26·11 28:5,8,11 29:16 31:10 32:8 33:24 34:9,21 35:1,24 36:14 37:3,23 38.8,9 39:24 40:5,11, 22 42:7,11 43:3,18

44:8 45:9 46:18,23 48:6 49:16,24 50:7 52:15,19 55:9,16,18, 20 56:2,16 57:4,6 59:16,20 61:2 63:14, 17,19 64:11,14,18,24 65:10,11,15 66:17 69:7 70:2,13,22 72:15, 24

recalling 66:16

received 9:21 29.6

recertified 26:24

recognize 7:6

recollection 24:21 33:9 42:24 46:7 47:5, 9,12,14 48:11 51:15 52:9 53:18,22 54:2,5, 55:13 59:9 61:21 63:19 71:9

record 12:9 13.15,18 20:15

recorded 21:17

recording 21:7

records 22:12 58.5 67.14

refresh 58:8 74:2,13, 22 75:7

refusing 6:13

regular 73 13

Reid 10:12,14

relation 39:7 45:21 47:3 53:13 60:18 62:1 73:8

relatives 5:19

relayed 65:3,8

remained 59:9

remember 13 5 16:1, 14,23 22:11 29:17 30:7,8,16 34:15 35:2, 13 36:3,17,21 39 4 40:1,6,24 41:1 42:12 44:20 45:6,10 46:12, 14,19 48:7,15,16 49:1, 17 51:14,17, 52:20 54:24 56:10,21,22 57:2 59:17,21,23 60:1, 9,20 61:3,7,10,11,20,

24 62:1 63:15 64:8 65:16,23 66:8 67:9,12, 20,23,24 68:5,7,11,12, 15,20 69 12,15,19 70:3,12,14,18 71:3,4 72:1,3,8,9,19,20 73:2, 16 75:24 76:3

repair 23:20,22 24:1

repeat 70:7

report 12:2,10,18,23 13:10,23 30:2 31:15 66:23 71:6

reportedly 29.22

reporter 4:11

reports 13:12,19 14:10 15:14 39:6

reprimand 9.21

reprimands 10:2

requested 7:2 12:6 57:14,20 58:9,23 67:17

Reserve 76:8

respect 13:23 74:16 75:1,11

respond 4:22 32:11 50:12,16,19

responded 14:15 50:20 66:24

responding 14:2 63:24 64:9 69:23 70:5, 8

rest 8:4

restrained 27:19

restricted 27:13

result 15:1

review 11:22 13:3 26:14 28:23

reviewed 12:1

Richard 11:1 14:22 15:6

Ricky 11:2 43·4

ring 14:12

rodriguez 4:3,10 7:1 12:5


JENSEN
Litigation Solutions

Case: 1:12-cv-05025 Document #: 32-5 Filed: 07/29/13 Page 29 of 30 PageID #:180

McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

Index: row..unconsciousness

row 47:13

rules 4:17

_____

S
_____

safety 62:14

sat 50:19 54:13,17

scene 34:1 36:15
42:22 48:23 52:4
62:15 63:8 64:24
65:23 66:16 67:10,17
68:6,7 70:11,17 71:8,
23 72:2,4,7 75:24

screamed 54:5

screen 21:15,16,19,
21

second-to-last 7:10

seconds 51:3,4,13
53:16,20 54:21 58:1
59:5 60:2,6 62:23 70.9

sergeant 23:17 32:3,5

serves 25:6

service 29:7

set 7:20

sets 12.3,8 13:3

Sheriff 14.5 66:4

Sheriff's 12.11,18
13:8,19 14:4,14 43:7
54 23 55:4 64:23 66.9

sheriffs 14:17

shift 19:9 22:7 23:12
27:22 28:3,10

shifts 31:2

shirt 18:10 29:23

short 16:3

shortly 42:2

shorts 29:23

shoulder 20:11

show 73:14

shows 21:16

shut 34:4,15

shuts 34:5

side 37:17 46:10
52:14,16,17,18

signature 7:9

silver 18:9

similar 23:8 24:7

single 52:8

sir 7:7 12:24

situation 64:7

slash 12:17

slight 56:14

slightly 33:14

sorting 65:24

sounds 28:2 60:9

south 53:3,4,6,14

speak 66.20

speaking 53:12 64:14
67:10

specific 11:12 19:8
30:14 36:13 60:16
68:18

specifically 8 22 9:4
23 9 24 2 30:3,12
40:11 67:23 69:15,17
72:12

spell 4:11

spoke 11:21 66:4,11,
17

spoken 67:5

spot 50.7,8

spread 25:13,17

squad 6:14 18:12,14,
17,22 19:2,8,10,12,13,
15,16,19,24 20:12,21
21:8,17 22.6,15,21
23:2,22 24:2 31:1,4,23
33:2,19,22 34:2 36:8
37:1 63:10

staffed 30·24

standing 45:19,20
46:3,5 47:3 48:13
49:15,19 51:1 53:21
55:13 68:7

start 5:3 21:7 27:22

started 5:9

state 4:8 5:6

State's 15:9 73:6,13,
17

stated 6:8

statement 64:8

statements 41:1
61:3,13

stating 23:9

station 23:13

stationary 59.10

status 26:17

stay 34:14

stemmed 14:21

Stephen 11:2 14.21
74·6

stomach 46:10

stop 17:20 41:24

stopped 42:2

store 8:8

stretcher 71:2

Strike 31:23 47:1
49:12

style 54:13 55:11

subject 6:13 9·1,23
15:19 29:21 43:20
63:14,17 65·4,5

subpoenaed 73:10,
11

sued 6:1

suing 6:16

summoned 73:11

supervisor 31:7,8,21

support 5:13

supposed 22:17 25:7
28:3

suspects 29:23

sustained 9:12 11:10,
14

swift 52:8

sworn 4:1,5

sync 22:17,21

system 21:21,23

_____

T
_____

talk 17·23

talked 64:12

talking 13:7 17:19
21:23 34:2 43:6 47:18
48:1 52:22 53:2 56:8,
23 60:2 66:9

tase 54:7,8

tased 6:15,18 25:24

Taser 24·8,12,19 25:2,
6,18,21 26:3,9,16,18,
24 37:2 42:4,7 44:15
50:1 51:7 55:17,19

tech 5:13

tended 70:19

test 24:15

testified 4:5 14:24
16:5 53:23

testify 16:20 73:7,15

testifying 16:13,15,
22 17:2

testimony 59:12

thing 36:7 54:3,18
64:3 66:8

thought 16:23

throw 39.23 40:9

time 6:17 8:6 10:7
16:22 17:3 19:7,23
22:1 23:14 26·8,19
27:22 29:8 30:14 32:3
35:16 42:18 46:1,6
50.24 51:23 52:2,3,24
54:6,20 55:10,11 56·8,
22 59:6,12,17 60:2
62:17 64:15 65:21,22
66:2,6,7, 68:8,9,13,14,
21,23 69:7,22,23,24
70:4,5,10,11 72:2,
73:3,14,15 74:11

times 26:6,7 36:15
43:17,18 44:8 73:16

timing 57:2,6,24

titled 23:18

today 76.4

today's 11:19

told 11:17 43:14 67:4
70:9 72:12 75:23 76:4

top 18:22 25:7

topics 74:3,14,23
75:8

TOT 59:3

totally 38:8

touching 49:6

training 5:14 10:7,8,
10 25:22 26:1,14

travel 63:3

treat 71:16

treating 71:11,14,17

trial 16:10 73:5,7,18,
19

true 8:4

turn 18:18 20:12,14,
23,24 21 20 23 11,12,
16 33:22 34:1

turned 14:1 20·7 21:6
24:22 33:20,24 34:6,8
53:24 54:1 59:4

turning 20:18,24 21:2
24:16,17 34:3

turns 54:4

Tyler 57:22

type 21:16 23:9 33.5

typically 58:22

_____

U
_____

unable 40:16

unanswered 8:3

uncle 5:22

unconscious 56:17

unconsciousness
56:15,23



McDowell vs. Lansing
Michael Erasmo Rodriguez - 03/04/2013

understand 4:19,22
  5:1 48:2 53:23 60:4
  64:1
unfounded 9:13,14
unhappy 9 2
uniform 18:5,7
uniformed 43.11 52:4
unincorporated
  28:19
unit 58:24 59:2
units 10:15 63:13 66:6
  68:8,13
University 5:6
upgrade 19:6
upgraded 19:5
upset 61:2,4,5,11,14,
  21

**V**

vehicle 23:10,20 24:1
verbal 4:18 41·1
verbally 50 13
verify 42:20
version 19:6
versus 6.5
victim 57:21 61:23
video 21:17
videotape 19:4
view 21:21 41:5,8
  53:16,20
voice 61:18,20
volume 61:20
voluminous 13:4

**W**

wait 4:21
waited 54:19
waive 76:8,9
walk 69:2

wanted 72:21
watching 55:14
weapons 42·3
wearing 38:9
week 5:14
weight 15:13
west 33:13 37:16
  53:3,4,6,7,10
wheeled 71:2
When's 73:3
white 29.24
whites 38:7
window 21:9
windshield 21:11,13
wise 5.8
withdraw 13:17
woman 48:14,15
women 37:21
word 9·15
worded 63:4
words 37:7,8 75:23
work 5:8,16,19 23:8,
  19 30:14
worked 5:11 8:8
working 5·3,10 22:7,
  9,16 23:2,4 24:3 30:15
works 21:2 25:6
write 24:6,7 39:6
written 9:21
wrong 23:10
wrote 24:4

**X**

X26 24:11

**Y**

year 26:12
years 26:13

yelling 51:8
yellow 25:4,5
Yonker 31:17 67:1,8

