

CERTIFIED COPY
A True Copy
Teste:
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 13-3423

MARLO MCDOWELL,

*Plaintiff-Appellant*,

*v.*

VILLAGE OF LANSING, *et al*,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cv-05025 — **Amy J. St. Eve**, *Judge*.

———————————

ARGUED APRIL 22, 2014 — DECIDED AUGUST 18, 2014

———————————

Before POSNER, WILLIAMS, and TINDER, *Circuit Judges*.

TINDER, *Circuit Judge*. Marlo McDowell appeals the summary judgment dismissal of his suit against the Village of Lansing and Officer Michael Rodriguez, in which he alleged, *inter alia*, that Officer Rodriguez violated his substantive due process rights by rendering him vulnerable to a blow to the face by a third party. We hold that Officer Rodriguez's conduct, even according to McDowell's depiction of the record,

was not sufficiently egregious to qualify as a constitutional tort or to vitiate his state-law immunity.

## I.  Background

On summary judgment we view the facts in the light most favorable to the nonmoving party. *Williams v. City of Chicago*, 733 F.3d 749, 752 (7th Cir. 2013). Of course, Officer Rodriguez disputes much of the account that follows, but McDowell is entitled to every reasonable inference that supports his claims.

McDowell alleges that, after working a night shift on June 25, 2011, he met three friends at Bottoms Up, a local restaurant and bar located in unincorporated Cook County, Illinois. They stayed there for about a half hour, until the bar's 4:00 a.m. closing time. McDowell and his companions then exited the front door, but they were confronted by a group of four or five other individuals, who were apparently looking for trouble. (One of the few things we know about this latter group is that one of them happened to be an off-duty police officer.) The opposing sides quickly came to blows, and the altercation spilled into the parking lot. McDowell attempted to break up the fight. Eventually he retreated to his car, only to see his adversaries attempt to vandalize it. That is when McDowell told one of his companions to call the police.

Michael Rodriguez, an on-duty police officer for the Village of Lansing, was dispatched to the scene. (Lansing is a nearby suburb of Chicago that lies within Cook County.) Officer Rodriguez found McDowell running in circles around parked cars, trying to get away from at least three men who were chasing him. Rodriguez exited his squad car, approached McDowell with his Taser drawn and pointed at

him, and ordered everyone to get on the ground. The chase immediately stopped and everyone promptly lay down—everyone that is, except one man named Morandi, who had been one of McDowell's antagonists in the fight.

While McDowell lay prone ten feet in front of Officer Rodriguez, looking up at him with his hands behind his head, Morandi began to slowly walk towards McDowell. When Morandi started his approach, he and McDowell were about 15 to 20 feet apart. A witness on McDowell's side of the fight testified that he thought at the time that Morandi "was about to do something." Officer Rodriguez did not issue a second warning for Morandi to stop and get on the ground, nor did he point his Taser at him. Morandi kept coming. About 15 seconds after McDowell had first lain down, Morandi got within striking distance and kicked him in the face.

McDowell has described the kick as a strong blow with a slow, deliberate wind-up, almost like a placekicker striking a football. The force of the impact broke his jaw, which required surgery. That was the only reported injury he suffered during the incident. McDowell further alleges that after the attack Officer Rodriguez failed to handcuff Morandi, who simply sat down of his own volition. He also claims that Officer Rodriguez did not request an ambulance for him. In fact, he complains that, after officers from the Cook County Sherriff's Office arrived, he was handcuffed before being transported to a hospital.

McDowell sued Officer Rodriguez under 42 U.S.C. § 1983 for allegedly violating his substantive due process rights under the Fourteenth Amendment. He included an Illinois common law claim for willful and wanton conduct against

both Officer Rodriguez and the Village of Lansing, and also brought a state-law indemnification claim against the Village. Following discovery, the district court dismissed McDowell's suit on summary judgment. The district court held that, even under the facts that McDowell set forth, no reasonable jury could find that "Officer Rodriguez's conduct was reckless and gratuitously endangered" McDowell. Likewise, the district court granted summary judgment to the Village on the state-law claims because "McDowell has not set forth evidence creating a factual dispute that Officer Rodriguez had deliberate intent to harm him." Absent that showing, McDowell could not overcome the immunity granted Officer Rodriguez under Illinois's Tort Immunity Act. 745 Ill. Comp. Stat. 10/2–202 (immunizing law enforcement unless their actions "constitute[] willful and wanton conduct"). McDowell timely appealed.

## II.    Discussion

We review a district court's decision to grant summary judgment *de novo*, and like the district court we grant McDowell every reasonable inference in his favor. *Kvapil v. Chippewa Cnty., Wis.*, 752 F.3d 708, 712 (7th Cir. 2014). We agree that McDowell has failed to create a legitimate question of material fact as to whether Officer Rodriguez violated his Fourteenth Amendment rights or engaged in willful and wanton conduct against him. The acts McDowell alleges are simply not egregious enough to vindicate his legal claims. Officer Rodriguez's alleged actions and decisions amounted to no more than mere negligence, if that.

Officer Rodriguez disputes the merits of McDowell's claim and also presents a defense of qualified immunity. We need not reach the qualified immunity defense however, be-

cause resolving the case on the merits will be simple enough. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). McDowell's constitutional claim is straightforward: the government constrained his liberty and made him more vulnerable to attack, thereby setting the stage for his injury. Officer Rodriguez himself testified that he had "detained" McDowell before Morandi kicked him.

In pressing his substantive due process claim, McDowell invokes the state-created danger doctrine. For a plaintiff to succeed on a theory of state-created danger, (1) "the state, by its affirmative acts must create or increase a danger" to him, (2) "the failure on the part of the state to protect an individual from such a danger must be the proximate cause of [his] injury," and (3) "the state's failure to protect [him] must shock the conscience." *King ex rel. King v. E. St. Louis Sch. Dist., 189*, 496 F.3d 812, 818 (7th Cir. 2007). Deciding exactly what qualifies as an "affirmative act" that "shock[s] the conscience" has proven difficult, and we have recently attempted to simplify the governing standard. *See Slade v. Bd. of Sch. Dirs. of City of Milwaukee*, 702 F.3d 1027, 1033 (7th Cir. 2012) ("Shouldn't it be enough to say that it violates the due process clause for a government employee acting within the scope of his employment to commit a reckless act that by gratuitously endangering a person results in an injury to that person?"). Regardless of the precise wording, the Supreme Court has made it clear that mere negligence is not sufficient to support a substantive due process claim. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848–49 (1998). Nor is gross negligence. *Archie v. City of Racine*, 847 F.2d 1211, 1219–20 (7th Cir. 1988) (en banc). Deliberate indifference to a person's welfare may be sufficient to give rise to a constitutional vio-

lation, depending on the circumstances. *Lewis*, 523 U.S. at 851.

McDowell has set forth a plausible case satisfying the first two of the *King* requirements. It is an open question whether McDowell would have been better off had Officer Rodriguez never showed up, and McDowell were left to take his chances with the men chasing him around the parking lot. But given that he ended up with a broken jaw, a reasonable jury might grant him the benefit of the doubt on that question. More to the point, once Officer Rodriguez arrived on the scene, he allegedly committed an affirmative act—detaining McDowell while threatening people were around him—that rendered him more vulnerable to Morandi's kick. According to McDowell's version of events, Officer Rodriguez could have chosen a different course of action that likely would have prevented his injury.

However, nothing McDowell alleges approaches the level of egregious conduct necessary to violate the substantive guarantees of Fourteenth Amendment. Officer Rodriguez arrived on scene alone; he had no partner or backup to help him. The incident occurred at night. Officer Rodriguez was significantly outnumbered by the four belligerents that he saw, and he did not know if others were involved. He did not know which of the men were hostile and which were victims. He drew his Taser in case he had to use non-lethal force, but that weapon is not particularly suited for crowd control. Although three of the men had obeyed the officer's warning and gotten down on the ground, they were not restrained in any way. McDowell was the closest person to Officer Rodriguez, and it therefore makes sense that he would occupy the bulk of his attention. Morandi did not make any

threatening statements or gestures as he slowly walked to-ward McDowell.

In light of those circumstances, we conclude that Officer Rodriguez did not disregard a known or obvious risk so much as he made a difficult decision that balanced legitimate competing dangers, both to himself and the men he detained. Indeed, it is not clear what Officer Rodriguez should have done differently to avoid McDowell's injury. Certainly, he might have paid more attention to Morandi, and issued another warning for him to stop (assuming McDowell is correct that no second warning was issued). But that would have afforded other suspects the opportunity to get up while the officer was preoccupied, and in any event it likely would not have made a difference. Once Morandi disobeyed his first command, simply repeating the order might actually have undermined Officer Rodriguez's authority. He could have tased Morandi, but that might have exposed him to attack from the other suspects. Physically positioning himself between Morandi and McDowell would have been a particularly bad idea, because he then would necessarily be turned away from one (or both) of them. And of course, encouraging McDowell to flee or defend himself would have been absurdly irresponsible. Officer Rodriguez had only a matter of seconds to decide among these and many other options. Even if he chose poorly—and we express no opinion on that point—his snap judgment did not rise to the level of a constitutional tort.

The time frame involved is particularly important when judges scrutinize law enforcement decisions resulting in injury. The Supreme Court has imposed an exacting standard on plaintiffs seeking to cast a swift, emergency police deci-

sion as an infringement of substantive rights. "[W]hen unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock" of conscience necessary for a substantive due process violation. *Lewis*, 523 U.S. at 853. The Court in *Lewis* therefore held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment." *Id.* at 854. Although this case does not involve a high-speed chase, this court has expanded the principle to encompass other emergency situations. In *Carter v. Simpson*, 328 F.3d 948, 952 (7th Cir. 2003), we held that "in emergency situations (such as high-speed chases) … conduct 'shocks the conscience' only if there was intent to cause harm." *Carter* involved a vehicle collision as an officer responded to an emergency call. In *Schaefer v. Goch*, 153 F.3d 793, 798 (7th Cir. 1998), we applied *Lewis* in the context of a shooting in the line of duty. *Id.* ("The *sine qua non* of liability in cases analogous to high-speed chases, therefore, is a purpose to cause harm.") (citation and quotation marks omitted). Other circuits have reached the same conclusion. *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) ("[W]here a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives."). Likewise, it is undisputed that Officer Rodriguez faced a potentially violent situation with only seconds to act. Whatever the appropriate standard—intent, deliberate indifference, recklessness, or some other formulation—it is clear that Officer Rodriguez did not violate McDowell's constitutional rights in making such a difficult decision on the spot.

McDowell has asserted some additional allegations re-
garding the officer's conduct after he was injured. He claims
that Morandi was not handcuffed but that he was, and that
Officer Rodriguez never called for an ambulance. However,
there is no evidence that this alleged conduct aggravated
McDowell's injury or worsened the situation in any way.
Moreover, nothing in the record suggests that Officer Rodri-
guez knew or should have known how badly McDowell was
injured, or that he required surgery. Other law enforcement
officers and emergency responders eventually arrived at the
scene, so the manner in which McDowell was transported to
the hospital does not shed much light on Officer Rodriguez's
state of mind in the moments before the kick. These addi-
tional allegations do not help McDowell.

By the same token, McDowell's state-law claims must fail
as well. In *Moran v. City of Chicago*, 676 N.E.2d 1316 (Ill. App.
Ct. 1997), the Illinois Appellate Court dismissed a suit in
which a participant in an altercation injured another long
after the police arrived. The court found that, before the
plaintiff sustained any injury, "the [officers] stopped the al-
tercation, separated the combatants, and attempted to ques-
tion them. At the time the plaintiff was injured, the defend-
ants were investigating the matter. These actions do not
show indifference or willful and wanton conduct." *Id.* at
1323. By comparison, Officer Rodriguez was alone and had
no chance to investigate the incident before Morandi struck.
There is no evidence that he wanted McDowell to be injured
or was indifferent to what happened to him. Indeed, Officer
Rodriguez arrived on scene, drew his Taser, and warned
everyone to get on the ground in order to protect McDowell
and others. "Wilful and wanton conduct, as contemplated in
[the Tort Immunity Act], consists of more than mere inad-

vertence, incompetence, or unskillfulness." *Geimer v. Chi. Park Dist.* 650 N.E.2d 585, 592 (Ill. 1995). McDowell has failed to allege anything more than that. Because Officer Rodriguez's actions were in no way willful or wanton, he and the Village enjoy immunity from McDowell's state-law claim. 745 Ill. Comp. Stat. 10/2–202.

### III.    Conclusion

We are not competent to decide whether Officer Rodriguez's actions represent good police work, and even if we were, we lack the factual record to make such a determination. We are confident, however, that his conduct did not violate McDowell's constitutional rights, and was not willful or wanton. The decision of the district court is AFFIRMED.